In the

# United States Court of Appeals

### For the Seventh Circuit

_____

No. 20-1809

ANDREW PAVLICEK,

*Plaintiff-Appellant*,

*v.*

ANDREW M. SAUL,
COMMISSIONER OF SOCIAL SECURITY,

*Defendant-Appellee*.

_____

Appeal from the United States District Court
for the Western District of Wisconsin.
No. 19-cv-41-slc — **Stephen L. Crocker**, *Magistrate Judge*.

_____

ARGUED MARCH 3, 2021 — DECIDED APRIL 7, 2021

_____

Before MANION, WOOD, and ST. EVE, *Circuit Judges*.

MANION, *Circuit Judge*. Andrew Pavlicek, a 49-year-old man whose anxiety manifests in persistent tremors and seizures, sometimes causing him to pass out, challenges his denial of Disability Insurance Benefits and Supplemental Security Income. He argues that the administrative law judge erred by (1) giving inadequate reasons for rejecting the opinion of his treating psychiatrist, (2) affording too much weight

to the opinions of two non-examining agency physicians, and (3) posing hypothetical questions to the vocational expert that failed to account for his limitations in concentration, persistence, and pace. We affirm because, despite Pavlicek's contentions and some imperfections in the ALJ's reasoning, the ALJ's decision was supported by substantial evidence.

## Background

Pavlicek applied for DIB and SSI benefits in early 2015, alleging that he had become disabled the previous year. As relevant to this appeal, he suffers from anxiety, depression, severe tremors, and pseudoseizures (seizures that resemble epileptic seizures but stem from psychological causes[1]). A long-time truck driver, he has a high-school education.

In 2013, Pavlicek began experiencing extreme tremors in his limbs or convulsions through his entire body, sometimes with loss of consciousness—all believed to be related to his anxiety. He was diagnosed with conversion disorder—a condition where neurological symptoms, though real, cannot be explained by physical evidence.[2] The condition manifests itself in two ways. One is pseudoseizures, or whole-body convulsions, sometimes with loss of consciousness. Once, for a period of a few weeks, he experienced a pseudoseizure every morning. Later, he experienced only around one per month on average. The other manifestation is tremors (or shaking in his arms or legs), which over time have become frequent and severe. Three instances of tremors stand out. Once, at a

[1] *Understanding Pseudoseizures*, Healthline, https://www.healthline.com/health/pseudoseizures (last visited March 30, 2021).

[2] *Conversion Disorder*, MedlinePlus, https://medlineplus.gov/ency/article/000954.htm (last visited March 30, 2021).

doctor's visit, his shaking grew out of control and he was sent to the emergency room. Another time, while riding in a car driven by his daughter, he began shaking violently from anxiety when she was pulled over for not wearing a seatbelt. EMTs had to be called to rush him to the hospital, where his tremors eventually subsided after he received medication. And once he required treatment for open wounds when his tremoring leg bashed against a bed.

Pavlicek saw several medical providers about his anxiety and the resulting tremors and pseudoseizures. In March 2015, he began receiving supportive psychotherapy from Dr. Jacqueline Bienek, who observed anxiety that waxed and waned and described occasional tremors. Dr. Bienek noted that, even during a tremor, Pavlicek could think coherently and talk at a normal rate and tone. And she regularly described him as mentally "coherent and focused." Pavlicek saw Dr. Bienek once or twice per month for over a year.

Beginning in May 2015, Pavlicek also saw Dr. Bababo Opaneye, a psychiatrist, for medication management and some counseling. Dr. Opaneye recorded diagnoses of major depressive disorder, panic disorder, and conversion disorder. He did not witness tremors during their sessions. Those sessions took place every two or three months and lasted 25 to 45 minutes.

In connection with Pavlicek's application, two non-examining agency consultants reviewed his records and determined that he could function with some limitations. First, during the initial review in March 2015, Dr. Carlos Jusino-Berrios determined that Pavlicek had moderate limitations in social functioning and in concentration, persistence, and pace. But he found that Pavlicek could still remember basic

information and simple instructions, could pay attention for up to two hours at a time, and could perform at a consistent pace "particularly if [] engaged in [] simple, repetitive tasks." In August 2015, at the reconsideration stage, Dr. Therese Harris concurred.

In May 2017, Pavlicek testified at a hearing before an ALJ about how his anxiety, tremors, and pseudoseizures prevented him from working. He explained that he had constant tremors "day and night." (At one point during the hearing, the ALJ even remarked that the shaking in Pavlicek's legs was "real obvious.") As for pseudoseizures, he reported seven episodes in the past 16 months when he lost consciousness; in seven other episodes, he remained conscious.

A vocational expert also testified at the hearing. In response to questions about employers' tolerance for absenteeism in unskilled workers, the expert replied that an employee could be absent no more than 8 to 12 days per year and off-task no more than 10% of the workday. The ALJ then asked a series of hypothetical questions about an employee with various restrictions (i.e., no complex tasks or decisions, no fast-paced production requirements, limited interaction with others, and limited reasoning ability), and in each case the expert replied that such an employee could not perform Pavlicek's past work but could perform other work available in the national economy (e.g., assembler, packager, and inspector positions).

The ALJ agreed to hold the record open so that Dr. Opaneye, the treating psychiatrist, could submit a disability report that he was completing. The following month, Dr. Opaneye submitted his report and opined that Pavlicek had severe functional limitations and could not work.

Pavlicek, the doctor said, met Listing 12.04 ("Depressive, bi-polar and related disorders")—based on his history of "recurrent panic and major depressant disorders" dating back to 2013. Dr. Opaneye rated Pavlicek at the highest level of impairment (precluded for more than 15% of a typical workday) in 19 of the 20 listed areas of functioning.

Applying the requisite five-step analysis, *see* 20 C.F.R. § 404.1520(a)(4), the ALJ determined that Pavlicek was not disabled. At step one, the ALJ found that Pavlicek had not been substantially gainfully employed since his alleged onset date. At step two, the ALJ determined that Pavlicek's affective disorders (major depression disorder, anxiety disorder with panic attacks, conversion disorder with mixed symptom presentation including non-neurological pseudoseizures, and a learning disorder) were all severe impairments. At step three, the ALJ concluded that none of those impairments equaled a listed impairment. At step four, the ALJ determined that Pavlicek retained the residual functional capacity to perform medium work with exceptions (as relevant here, that he be limited to understanding, remembering and carrying out simple instructions and routine, repetitive tasks; that he only make simple work-related decisions in an environment without fast-paced production requirements and with few or no changes in work duties; and that he be limited to only occasional, brief, and superficial interaction with the public and coworkers, and only occasional interaction with supervisors). Finally, at step five, the ALJ concluded that Pavlicek could not perform his past relevant work but, given his residual functional capacity, he could perform other work that existed in significant numbers in the national economy.

In reaching these determinations, the ALJ explained that he largely refused to credit Dr. Opaneye's opinion. First, Dr. Opaneye had not justified how his findings could apply "as far back as 2013," given that he did not begin treating Pavlicek until May 2015. Second, Dr. Opaneye relied heavily on Pavlicek's own subjective reporting. Third, Dr. Opaneye's conclusion that Pavlicek met Listing 12.04 did not square with the "infrequent" nature of their treatment relationship. Fourth, Dr. Opaneye's assessment of severe functional limitations (the "most extreme" in nearly every category asked) was unsupported by the "great weight of clinical records," including his own treatment notes. The ALJ gave more weight to the opinions of Dr. Jusino-Berrios and Dr. Harris because he found them more consistent with the record.

## Analysis

### I.     ALJ's Treatment of Examining Physician's Opinion

Pavlicek argues that the ALJ wrongly discounted the opinion of his treating psychiatrist, Dr. Opaneye, that he met Listing 12.04 for an Affective Disorder, had serious functional limitations, and could not obtain competitive work. As a treating psychiatrist (a designation that the ALJ accepted), Dr. Opaneye's opinion was entitled (under the regulations in effect at the time, s*ee* 20 CFR § 404.1527) to controlling weight unless the ALJ provided "good reasons" for affording it less weight. 20 C.F.R. § 404.1527(c)(2); *Walker v. Berryhill*, 900 F.3d 479, 485 (7th Cir. 2018).

Pavlicek argues that the ALJ unreasonably concluded, without explanation, that Dr. Opaneye's opinion lacked support in the record. In Pavlicek's view, the medical records

support Dr. Opaneye's opinion that Pavlicek met Listing 12.04. Specifically, Pavlicek points to his ongoing treatment for anxiety and depression and his history of tremors causing emergency room visits, wounds, and difficulty with basic tasks.

But substantial evidence supports the ALJ's finding that the medical records—including Dr. Opaneye's own records—undermined the doctor's opinion. An ALJ may decline to give a treating physician's opinion controlling weight when the opinion is inconsistent with the physician's treatment notes. *See Schmidt v. Astrue*, 496 F.3d 833, 842–43 (7th Cir. 2007). Contrary to his June 2017 report, Dr. Opaneye's notes from each session with Pavlicek reflected essentially normal cognition. Specifically, at each visit, Dr. Opaneye found Pavlicek oriented as to person, place, time, and situation and found his thought process "coherent, logical, goal-directed, [with] associations intact." He described Pavlicek's attention and concentration as "functionally intact" and observed "no more than average distractibility" and "no apparent short-term or long-term memory deficits." Dr. Opaneye's June 2017 report, by contrast, describes an easily distracted patient with impaired memory and concentration. Dr. Opaneye rated Pavlicek at the highest level of impairment in, among other things, "maintain[ing] attention and concentration for extended periods of time"; "work[ing] in coordination with or in proximity to others without being distracted by them"; and "understand[ing] and remember[ing] very short and simple instructions."

That said, two aspects of the ALJ's reasoning give us pause, although they do not change our conclusion that substantial evidence supported discounting Dr. Opaneye's opinion. First, as Pavlicek points out, the ALJ downplayed the

significance of Dr. Opaneye's opinion because their treatment relationship was "infrequent":

Dr. Opaneye's assessment that the claimant satisfied the requirements of a listing is also inconsistent with his own infrequent treatment relationship with the claimant, as he reported that he only met with the claimant for 25 to 45 minutes every two or three months. This level of follow-up treatment does not support listing level functional problems.

The inference that the ALJ drew from the frequency of Pavlicek's visits with Dr. Opaneye is puzzling. The ALJ suggests that the extreme functional limitations noted by Dr. Opaneye ought to require follow-up treatment more extensive and frequent than brief sessions every two or three months. But Dr. Opaneye never purported to be Pavlicek's lone caregiver. On the contrary, he regularly noted that Pavlicek would benefit from seeing other providers, and he established a treatment plan that included follow-up appointments with Pavlicek's primary-care doctor and neurologist, as well as "frequent individual therapy." Dr. Opaneye also consistently encouraged Pavlicek to see a therapist. But although similar instances of faulty logic by an ALJ have led this court to vacate a judgment and remand, *see, e.g.*, *Scrogham v. Colvin*, 765 F.3d 685, 696 (7th Cir. 2014) (reversing where ALJ discounted treating physician's opinion after ignoring evidence that would have resolved inconsistency), reversal is not warranted in this case because here, unlike in *Scrogham*, substantial evidence supported an independent basis for discounting Dr. Opaneye's opinion, namely the conflict between Dr. Opaneye's 2017 report and his own treatment notes.

The second troubling aspect of the ALJ's ruling was his decision to discredit Dr. Opaneye's opinion based on the

doctor's failure to justify his conclusion that Pavlicek met List-ing 12.04 "as far back as 2013," given that he did not begin treating Pavlicek until May 2015. Pavlicek characterizes this conclusion as "myopic," noting that Dr. Opaneye was on staff at a medical practice (Ministry Medical) that had other pro-viders' records tracing Pavlicek's tremors back to 2013.

Substantial evidence also does not support this determi-nation by the ALJ, though this question is close. The ALJ pre-sumes that Dr. Opaneye had no basis for opining on Pavlicek's condition before the beginning of their treatment relationship in 2015. But the record shows (contrary to the conclusions of the Commissioner and the district court) that Dr. Opaneye did consult the records from other providers. His report referred to episodes that Pavlicek suffered on or around April 10, 2015; May 14, 2015; and July 29, 2015 (A.R. 1236)—three dates when Pavlicek saw Dr. Bienek. (A.R. 908, 910, 960.) Had Dr. Opaneye reviewed only his own treatment records, he could not have known that those dates were significant. And Dr. Bienek reported that Pavlicek's tremors began in 2013. So Dr. Opaneye may in fact have a ba-sis for saying that Pavlicek could have met the listing "as far back as 2013." *See Scott v. Astrue*, 647 F.3d 734, 739 (7th Cir. 2011) (reversing where ALJ found treating physician's opin-ion lacked support in the record but ALJ ignored evidence that supported the opinion and it was "possible" that the phy-sician considered that evidence).

But although we question the ALJ's reasoning in these re-spects, our concerns do not warrant reversal under this court's deferential substantial-evidence review. The ALJ's discrediting of Dr. Opaneye's opinion was supported by sub-stantial evidence: the stark contrast between Dr. Opaneye's

June 2017 report and his treatment notes constitutes "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Biestek v. Berryhill*, 139 S. Ct. 1148, 1154 (2019) (internal quotation omitted).

## II.    ALJ's Treatment of the Agency Consultants' Opinions

Pavlicek's remaining arguments are even less compelling. He argues, for instance, that the ALJ afforded too much weight to the agency consultants' assessments of his residual functional capacity (RFC)—assessments that he deems internally inconsistent. In his view, the checklist portion of the form (rating him as "moderately" limited in areas related to maintaining concentration and working at a constant pace) conflicts with the narrative portion (stating that he could "perform at a consistent pace particularly if is [sic] engaged in a simple, repetitive tasks [sic]").

But the ALJ reasonably relied on the narrative RFC because it was in fact consistent with the "moderate" checklist ratings. The ALJ must consider whether the consultants' narrative RFC assessments "adequately encapsulate[d] and translate[d]" the checklist. *See Varga v. Colvin*, 794 F.3d 809, 816 (7th Cir. 2015). A "moderate limitation" is defined by regulation to mean that functioning in that area is "fair." 20 C.F.R. Pt. 404, Subpt. P, App. 1. As the Commissioner points out, "fair" in ordinary usage does not mean "bad" or "inadequate." So a "moderate" limitation in performing at a consistent pace seems consistent with the ability to perform simple, repetitive tasks at a consistent pace. Further, that assessment is consistent with both Dr. Jusino-Berrios's and Dr. Harris's findings that Pavlicek could carry out simple

instructions and make simple decisions with no significant limitation.

Pavlicek also argues that the ALJ should not have relied on Dr. Jusino-Berrios's 2015 opinion, because it was outdated in light of his later medical records. Pavlicek alludes to later episodes related to his tremors—records of two emergency room visits, the incident when he suffered open wounds after a tremor bashed his leg against a bed, and a doctor's observation that his tremors caused difficulties in functional matters such as walking and sitting in a chair.

But Dr. Jusino-Berrio's opinion was not so outdated that the ALJ had to disregard it. An ALJ must not rely on a physician's assessment "if later evidence containing new, significant medical diagnoses reasonably could have changed" the physician's views. *See Moreno v. Berryhill*, 882 F.3d 722, 728 (7th Cir. 2018). Dr. Jusino-Berrios already knew, however, that Pavlicek was experiencing severe tremors, so the later records corroborating this condition do not necessarily undermine his conclusions. Also, Dr. Jusino-Berrios's opinion predated the ALJ hearing by only two years, unlike *Moreno*, which involved a seven-year-old assessment undermined by later records of entirely new symptoms. 882 F.3d at 725, 728–29. Finally, at the reconsideration stage, Dr. Harris reviewed the new records and explicitly agreed that the new evidence supported Dr. Jusino-Berrios's initial assessment.

## III.    ALJ's Hypothetical Question for Vocational Expert

Finally, Pavlicek challenges two aspects of the hypothetical question that the ALJ posed to the vocational expert. First, he argues that the ALJ erred in stating that the hypothetical

individual could follow complex instructions (that is, instructions with more than two steps, or "GED level two" reasoning). Because Dr. Jusino-Berrios and Dr. Harris opined that Pavlicek could follow only simple instructions (that is, instructions with at most two steps, or "GED level one" reasoning), Pavlicek argues that the hypothetical question and RFC should have included a limitation to simple instructions.

But any error was harmless because limiting Pavlicek to simple instructions would not have changed the ALJ's determination. After the vocational expert answered the ALJ's question about an individual who could follow complex instructions, the ALJ posed another hypothetical question that mirrored the first except for limiting the hypothetical individual to simple instructions. Because the expert testified that this restriction was not work preclusive, the ALJ would have found Pavlicek able to work regardless of whether the RFC restricted him to simple or complex instructions.

Pavlicek next argues that the hypothetical question failed to account for his limitations in maintaining concentration, persistence, and pace. He points to his history of extreme tremors in minimally stressful situations and argues that his tremors would prevent him from concentrating, persisting, and maintaining pace for a full work week.

But substantial evidence supports the ALJ's conclusion that the restrictions in the hypothetical question adequately addressed Pavlicek's "moderate" limitations in concentration, persistence, and pace. The question included the same restrictions that Dr. Jusino-Berrios and Dr. Harris stated would accommodate Pavlicek's limitations. The ALJ's reliance on those medical opinions was permissible. S*ee Burmester v. Berryhill*, 920 F.3d 507, 511 (7th Cir. 2019). And notably, it is

"unclear what kinds of work restrictions might address [Pavlicek's] limitations in concentration, persistence, or pace because he hypothesizes none." *Jozefyk v. Berryhill*, 923 F.3d 492, 498 (7th Cir. 2019).

Accordingly, we AFFIRM the judgment of the district court.