In the

# United States Court of Appeals
## For the Second Circuit

August Term 2021

No. 21-621-cv

JESSICA RUCKER

*Plaintiff-Appellant*,

v.

KILOLO KIJAKAZI, ACTING COMMISSIONER OF THE SOCIAL SECURITY
ADMINISTRATION[1]

*Defendant-Appellee*.

Appeal from the United States District Court
for the Northern District of New York
No. 21-621- cv
David E. Peebles, Magistrate Judge, Presiding.
(Argued June 3, 2022; Decided September 6, 2022)

Before:      LEVAL, PARKER, and MENASHI, *Circuit Judges*.

Plaintiff-Appellant Jessica Rucker filed for Social Security benefits, but her application was denied by the Social Security Commissioner. The Appeals Council denied review, which made the Commissioner's decision final. Rucker appealed that decision to the United States District Court for the Northern District of New York (Peebles, *MJ.*), which denied her motion and granted the

---

[1] Kilolo Kijakazi became the Acting Commissioner of Social Security on July 9, 2021. Pursuant to Fed. R. App. 43(c)(2), Kijakazi was accordingly substituted for the previous Commissioner of Social Security, Andrew Saul, as the defendant in this suit.

Commissioner's motion for judgment on the pleadings. Rucker now appeals from that judgment. We hold that the district court failed to properly assess Rucker's Residual Functional Capacity (RFC) with regard to her ability to work consistently as well as her limitations regarding social interactions, and that substantial evidence accordingly does not support the determination that Rucker's psychological impairments do not render her disabled. By contrast, we hold that substantial evidence does support the determination that Rucker's physical impairments do not render her disabled. Accordingly, the judgment of the district court is **AFFIRMED in part and REMANDED in part.**

Judge Menashi dissents in a separate opinion.

PETER A. GORTON, Lachman & Gorton, Endicott, NY, *for Plaintiff-Appellant*.

NATASHA OELTJEN (Antoinette T. Bacon, Acting United States Attorney; Daniel Tarabelli, Special Assistant U.S. Attorney, Michael J. Pelgro, *on the brief*, Regional Chief Counsel—Region I Office of the General Counsel, Social Security Administration, Boston, MA), *for Defendant-Appellee*.

BARRINGTON D. PARKER, Circuit Judge:

Plaintiff-Appellant Jessica Rucker appeals from a judgment of the United States District Court for the Northern District of New York (David E. Peebles, *MJ.*). The court affirmed Administrative Law Judge (ALJ) Elizabeth Koennecke's determination that Rucker was not disabled within the meaning of 42 U.S.C. § 1382(a)(1) because she was capable of performing jobs in the national economy.

We hold that substantial evidence does not support the ALJ's conclusion that Rucker's psychiatric impairments do not render her disabled and thus eligible for Supplemental Security Income (SSI). *See* 42 U.S.C. § 1382(a)(1). We also hold that substantial evidence does support the ALJ's determination that Rucker's physical impairments do not render her disabled. Accordingly, we affirm in part and remand in part for proceedings consistent with this opinion.

The facts as found by the ALJ are as follows. Rucker was born in 1991 and alleged that her disability onset date was August 1, 2016. She is approximately 5-foot 2-inches tall and weighs between 245 and 250 pounds. Rucker is single, has no children, and lives in an apartment with her mother. She has a high school education; she received an Individualized Education Program (IEP) diploma and was in special education classes where she was classified as learning disabled. Rucker attended two semesters at Broome Community College, where she received some accommodations due to her psychological conditions, but she ultimately failed to complete her course of study. Rucker has also participated in a Catholic Charities Work Training Program.

Rucker stopped working altogether in August of 2015. At the time, she had been in the process of training to work at a café. Prior to that training,

Rucker had worked as a cashier, a cleaner, and overnight stocker. The ALJ had concluded that none of those positions constituted substantial gainful employment.

Rucker suffers from various mental impairments as well as low intellectual functioning. She has an IQ of 70 and has been diagnosed with bipolar disorder, borderline personality disorder, schizoaffective disorder, adjustment disorder, and depression. She has a history of self-mutilation, suicide attempts, suicidal ideation, homicidal ideation, auditory hallucination, and paranoid delusions. For psychiatric care, Rucker has been seeing Physician Assistant Erica Hill since March 2016. She has also received treatment once a month from her psychiatrist, Dr. Sobia Mirza, and her Social Worker, LCSW Megan Hagerbaumer, for roughly four years.

Rucker has been hospitalized numerous times for her psychiatric conditions. In April 2016, she was hospitalized for five days due to increased depression, anxiety, and self-harm behaviors. On June 28, 2016, at the initiative of Dr. Mirza, Rucker was involuntarily hospitalized for two days pursuant to N.Y. Mental Hygiene Law 9.551 because she threatened to harm to her ex-boyfriend and his new girlfriend. On March 10, 2017, again at Dr. Mirza's recommendation,

4

Rucker was involuntarily hospitalized for one week due to suicidal ideation. On April 25, 2017, Rucker self-admitted to the hospital for one week presenting with anxiety and worsening auditory hallucinations and persecutory delusions. In January 2019, Rucker went to the emergency room complaining of depression and suicidal and homicidal thoughts. Rucker has been prescribed several medications for her psychiatric conditions including Citalopram, Metoprolol, Trazodone, Mirtazapine, Olanzapine, Remeron, Celexa, and Latuda.

Physically, Rucker suffers from lower back pain, obesity, and hypertension. An x-ray of her back from August 12, 2016 revealed moderate degenerative spondylosis (disc space narrowing) and osteophyte formation. For these conditions, she has been prescribed ibuprofen, Tylenol, and a muscle relaxant.

Rucker applied for Title II and Title XVI Social Security benefits on June 14, 2016, alleging an onset date of January 1, 2013, which was later amended to August 1, 2016. This amendment took out of play Rucker's Title II application, leaving only the Title XVI, or Supplemental Security Income (SSI) application.

In August 2016, Dr. Sara Long performed a consultative psychiatric evaluation and found that Rucker's cognitive functioning was below average,

"possibly on the borderline or extremely low range," that her insight and judgment were "poor to fair," and that she had mild to moderate limitations with respect to following and understanding simple directions and performing simple tasks. Dr. Long diagnosed Rucker with borderline personality disorder, substance abuse in early remission, and schizoaffective disorder.

In September 2016, non-examining state agency psychologist Dr. S. Juriga reviewed the record and found that Rucker had no more than moderate limitations in a variety of areas related to understanding and memory, sustained concentration and persistence, and social interaction.

In November 2017, Dr. Adam Krantweiss performed a 2-hour assessment of Rucker's intellectual functioning, academic achievement, and adaptive behavior. Dr. Krantweiss determined Rucker's IQ to be 70, which is in the extremely low to borderline range, and stated that she has "moderate to severe deficits in reading, sentence comprehension, spelling, and math."

In August 2018, Rucker's treating social worker LCSW Megan Hagerbaumer submitted a functional capacity assessment indicating extreme limitations in Rucker's abilities to accept instructions, respond appropriately to criticism from supervisors, get along with co-workers, and respond

6

appropriately to ordinary stressors in a work setting requiring her to perform simple tasks. Hagerbaumer reported that Rucker has bipolar disorder, fluctuating moods, suicidal ideation, a history of auditory hallucinations, and sleep difficulties.

In September 2018, treating psychiatrist Dr. Mirza submitted a functional capacity assessment indicating that Rucker has marked limitation (defined as "serious limitation," or a "substantial loss in the ability to effectively function," *i.e.*, a "loss…greater than 33%") in her ability to maintain regular attendance without interruptions from psychologically based symptoms.

On October 10, 2018, ALJ Koennecke conducted a hearing on Rucker's application. A supplemental hearing with a vocational expert was conducted on March 11, 2019. The vocational expert testified that employers will not tolerate employees who are off task more than 10% of the day or absent more than one day per month.

On March 19, 2019, the ALJ issued a decision finding that Rucker could perform the full range of work at all exertional levels, that she had "the very basic capacity to read, spell, or perform mathematical calculations," and that she could perform simple work and make occasional work-related decisions, but that

7

she should avoid work that requires joint effort and that she should have no contact with the public. The ALJ found none of Rucker's physical conditions to be "severe."

The ALJ's conclusions became a final Agency determination on September 17, 2019, when the Social Security Administration Appeals Council denied Rucker's request for review. The denial was appealed to a magistrate judge who found no error in the ALJ's consideration and weighing of the various medical opinions and determined that substantial evidence supported the ALJ's findings. Accordingly, the court granted the Commissioner's motion for judgment on the pleadings and Rucker appealed to this Court.

## DISCUSSION

Under the Social Security Act, on this appeal "[t]he relevant inquiry is whether the ALJ applied the correct legal standards and whether the ALJ's determination is supported by substantial evidence." *Cichocki v. Astrue*, 729 F.3d 172, 177 (2d Cir. 2013); 42 U.S.C. § 405(g). Accordingly, we must "conduct a plenary review of the administrative record to determine if there is substantial evidence, considering the record as a whole, to support the Commissioner's decision and if the correct legal standards have been applied." *Estrella v. Berryhill*,

8

925 F.3d 90, 95 (2d Cir. 2019). We will overturn a SSA decision only if the ALJ applies an incorrect legal standard, or if the ALJ's ruling is not supported by substantial evidence. *Talavera v. Astrue*, 697 F.3d 145, 151 (2d Cir. 2012). The substantial evidence standard is "not high." *Colgan v. Kijakazi*, 22 F.4th 353, 359 (2d Cir. 2022) (quotation marks omitted). It is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Burgess v. Astrue*, 537 F.3d 117, 127 (2d Cir. 2008) (quotation marks omitted). We conclude that the ALJ's assessment of Rucker's residual functional capacity contained two significant errors.

Substantial evidence does not support the ALJ's determination that Rucker "can perform the full range of work at all exertional levels" and that that there is no diminishment in her ability to work consistently. The ALJ found that Rucker "can have normal supervision" but that she should have no contact with the public.

First, the ALJ's assessment of Rucker's difficulties with social interactions was not supported by substantial evidence. The ALJ found that Rucker could have no contact with the public and should "avoid work requiring more complex interaction or joint effort to achieve work goals[.]" The ALJ stated that "work

performed alone except for normal supervision" would qualify as such work, but she did not limit the amount of time that Rucker should spend with co-workers, nor did she place any formal limitations on Rucker's interaction with her supervisors. The ALJ apparently concluded that limiting Rucker's interactions with the public would be sufficient.

It is unclear what evidence supported that conclusion. The ALJ stated that she gave substantial weight to the opinion of Dr. Juriga. Despite theoretically doing so, though, the ALJ's determination did not factor in Dr. Juriga's conclusion that Rucker is "moderately limited" in her abilities to: (i) accept instructions and respond appropriately to criticism from supervisors and (ii) get along with coworkers or peers without distracting them or exhibiting behavioral extremes. The determination also failed to account for the fact that Dr. Long diagnosed Rucker with borderline personality disorder and schizoaffective disorder and had concluded that "[i]t is not clear that [Rucker] is relating adequately with others" and that her "psychiatric symptoms might cause problems in this area." Although an ALJ's opinion "need not perfectly match any single medical opinion in the record," it must nevertheless be supported by substantial evidence. *Schillo v. Kijakazi*, 31 F.4th 64, 78 (2d Cir. 2022). Here, the

ALJ did not cite any contrary evidence, nor is any such evidence apparent in the record. As discussed above, the other medical experts offered similar or more negative assessments of Rucker's social limitations.

On appeal, the Commissioner does not identify any evidence supporting this aspect of the ALJ's decision. Instead, the Commissioner argues that any omission as to social interactions was harmless error, since the jobs identified by the vocational expert were consistent with additional restrictions. Red. Br. at 78-79. The jobs identified by the vocational expert have "People Ratings" of "8," according to the Department of Labor's Dictionary of Occupational Titles. This designation means that these jobs require the "lowest possible level of human interaction in the workplace." *Lane v. Colvin*, 643 F. App'x 766, 770 n.1 (10th Cir. 2016).

We do not agree that the omission was harmless. First, the Commissioner's logic is circular. The premise of Rucker's argument is that her social limitations prevent her from being employed in any workplace. To assume that the level "8" jobs would not burden her, because they involve a very low level of human interaction, begs the question of whether that low level is itself sufficient. Second, the Social Security Administration has itself emphasized the importance of

11

crafting an individualized assessment of non-exertional impairments, such as difficulties interacting with others. *See* Social Security Ruling 85-15: Titles II, XVI: Capability to Do Other Work—The Medical-Vocational Rules As A Framework For Evaluating Solely Non-exertional Impairments, 1985 WL 56857, at \*6 ("The reaction to the demands of work (stress) is highly individualized, and mental illness is characterized by adverse responses to seemingly trivial circumstances. …Any impairment-related limitations created by an individual's response to demands of work…must be reflected in the RFC assessment.").

Next, we hold that the ALJ misapplied the treating physician rule as to Dr. Mirza. At the time Rucker filed her claim for benefits, the SSA's treating physician rule required the ALJ to treat the opinions of treating physicians as controlling, "so long as it is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in [the] case record." *Estrella*, 925 F.3d at 95 (internal quotation marks omitted).[2] In the event the ALJ determined that the opinion

---

[2] A different rule governs more recently filed claims. *See Colgan*, 22 F.4th at 359 n.2 ("For claims filed after March 27, 2017, however, ALJs 'will not defer or give any specific evidentiary weight, *including controlling weight*, to any medical opinion(s) or prior administrative medical finding(s), including those from your medical sources.' 20 C.F.R. §§ 404.1520c(a) (emphasis added), 416.920(c)."). We express no opinion as to whether the application of this revised rule would warrant a different outcome.

12

should not be treated as controlling, and should instead be assigned a lower weight, the rule further required that the ALJ articulate "good reasons" for each decision. *Id.* Here, none of the five reasons cited by the ALJ provided a "good reason" to discount Dr. Mirza's opinion.

*First*, the ALJ rejected Dr. Mirza's opinion on the grounds that it was "based solely on the claimant's reports." Psychiatric testing is inherently based on subjective reports. A medical diagnosis will often be informed by the patient's subjective description of his or her symptoms. *See Green-Younger v. Barnhart*, 335 F.3d 99, 107 (2d Cir. 2003) ("The fact that Dr. Helfand also relied on Green-Younger's subjective complaints hardly undermines his opinion as to her functional limitations, as a patient's report of complaints, or history, is an essential diagnostic tool."). That is all the more true in cases involving mental health, which tend to be less susceptible to objective testing and assessment. *See Price v. Colvin*, 794 F.3d 836, 840 (7th Cir. 2015) ("[P]sychiatric assessments normally are based primarily on what the patient tells the psychiatrist...."). Accordingly, we cannot accept the fact that Dr. Mirza's conclusions relied on subjective methods of analysis as a reasonable ground for discounting a treating physician's opinion.

13

*Second*, the ALJ cited the fact that Rucker, at various times, denied experiencing psychiatric symptoms. However, it is well documented that Rucker has a learning disability and low IQ, as well as "poor insight" into her mental illness, which provides an entirely plausible medical explanation for her frequent denials that she is experiencing psychological symptoms. Additionally, Rucker's own denials of her illness overlook her extraordinarily robust history of significant objective psychiatric symptoms, Comprehensive Psychiatric Emergency Program (CPEP) visits, and emergency inpatient hospitalizations.

*Third*, the ALJ reasoned that "there is no indication that the claimant was frequently absent from counseling." But Rucker's ability to attend counseling sessions—in which she is receiving treatment to alleviate her symptoms—has no bearing on her ability to attend work. Unlike a physician's office, work is a different, more stressful environment for Rucker in which her psychiatric triggers are exacerbated by co-worker interaction and the need to respond appropriately to supervision. *Cf. Colgan*, 22 F.4th at 363 ("[W]e disagree with the ALJ that Colgan's ability to engage in certain activities of daily living—such as caring for her two children, preparing meals and washing dishes, and driving to her medical appointments—provided substantial record evidence to discount Dr.

14

Ward's medical opinion."); *Balsamo v. Chater*, 142 F.3d 75, 81 (2d Cir. 1998) ("[A] claimant need not be an invalid to be found disabled under the Social Security Act[.]") (quotation marks omitted). Accordingly, we believe that relying on attendance at medical appointments is unhelpful in determining whether an individual with significant psychiatric issues can consistently show up and successfully function in a work environment. *Patrick M. v. Saul*, No. 18 Civ. 290, 2019 WL 4071780, at *10, 2019 U.S. Dist. LEXIS 146948, at *28 (N.D.N.Y. Aug. 28, 2019). ("Plaintiff's ability to attend medical appointments and engage in other daily activities of limited duration do[es] not correlate to the Plaintiff's ability to stay on-task during an eight-hour workday or the likelihood that he would miss work several days per month...); *see also Christine P. v. Saul*, No. 6:20-CV-00702 (NAM), 2021 WL 1854508, at *11 (N.D.N.Y. May 10, 2021); *Monahan v. Berryhill*, No. 17 C 7702, 2018 WL 3218660, at *4 (N.D. Ill. July 2, 2018) ("[T]he fact that plaintiff attended periodic clinic appointments is a far cry from establishing that he can work a normal workday and week."). As the court stated in *Virden v. Colvin*, No. 14-CV-1219, 2015 WL 5598810, at *11 (C.D. Ill. Sept. 22, 2015), "a claimant's regular attendance at medical appointments says very little about her ability to work during her appointments. Indeed, it would seem that a person

15

suffering from [significant impairments] would have a strong interest in attending appointments and seeking relief rather than missing appointments."

*Fourth*, the ALJ determined that Dr. Mirza "acknowledged that she was not able to fully assess the claimant's mental functioning." The basis for this conclusion appears to be the fact that Dr. Mirza did not check certain boxes on a checkbox form, adding a note that she was "not able to assess" Rucker's performance in those categories. The ALJ ignored the fact that Dr. Mirza limited these caveats only to particular categories, writing in another section that certain areas had not been "a focus of treatment at this clinic." As the ALJ "ignored the context of the notation," this reason was also not a sufficient basis to discount Dr. Mirza's opinion as to other categories. *Colgan*, 22 F.4th at 363 (quoting *Selian v. Astrue*, 708 F.3d 409, 418-19 (2d Cir. 2013) (per curiam)).

*Fifth*, the ALJ stated that Dr. Mirza's opinion was inconsistent with other evidence in the record. Specifically, the ALJ cited "progress reports" in which Mirza described Rucker's mental status evaluations as normal. However, as the ALJ noted, these progress reports were not uniformly positive, and indeed were punctuated by episodes of hospitalization and suicidal ideation. Because a pattern of relative calm punctuated by manic episodes was consistent with Dr.

16

Mirza's diagnosis of unspecified bipolar disorder, it was not permissible for the ALJ to "cherry-pick[]" the positive aspects of the progress reports to discount Mirza's opinion as unsupported by the evidence. *Estrella*, 925 F.3d at 97.

The ALJ determined that these reports were more consistent with Dr. Juriga's and Dr. Long's reports, and that they "undermine[d] the significant limitations" that Dr. Mirza identified. It is unclear whether the ALJ meant that these two opinions also justified discounting Dr. Mirza's assessment. To the extent that the ALJ reached such a conclusion, it was error. We have repeatedly "cautioned that ALJs should not rely heavily on the findings of consultative physicians after a single examination." *Selian*, 708 F.3d at 419; *see also Schillo*, 31 F.4th at 78 n.5 ("[I]t can be problematic when an ALJ affords [the findings of a consultative physician] more weight than a treating physician's findings[.]"). Dr. Long and Dr. Juriga each made only one assessment of Rucker's health. After these reports were made, Rucker suffered additional hospitalizations due to symptoms of mental illness. This additional context limited the value of these opinions. *See, e.g.*, *Estrella*, 925 F.3d at 98 ("…[A] one-time snapshot of a claimant's status may not be indicative of her longitudinal mental health."); *Selian*, 708 F.3d 419 (error to credit consultative examiner over treating physician

17

when only one consultative examination had been performed, and the examination "occurred before [the treating physician] suspected that Selian might have been suffering from fibromyalgia"). Further, Dr. Juriga's report was both exceptionally cursory and misstated the record.[3] Although Dr. Long's report was more expansive and did not contain similar errors, it was also more consistent with Dr. Mirza's findings. Dr. Long concluded that Rucker had "marked limitation" with respect to decision-making. She also opined that "[i]t is not clear that [Rucker] is relating adequately with others. Her psychiatric symptoms may cause problems in this area. She presents with low stress management." Dr. Long concluded that Rucker's conditions "appear to interfere with her ability to function on a regular basis." Although Dr. Long also made more positive assessments of Rucker's capabilities, the ALJ made no effort to "reconcile the contradiction[s]" between this report and Dr. Mirza's. *See Selian*, 708 F.3d at 419. Accordingly, Dr. Long's and Dr. Juriga's reports were not, on this record, a "good reason" to discount Dr. Mirza's opinion.

---

[3] As the Commissioner concedes, Dr. Juriga stated that Rucker was only hospitalized for one day in June 2016, when in fact it was two days. That error is significant because it directly concerns Dr. Juriga's conclusion that Rucker would not suffer any absences at work: indeed, it was only one of two pieces of evidence that Dr. Juriga cited for this conclusion.

18

For the foregoing reasons, we conclude that the "substance" of the treating physician rule was not properly applied. *Schillo*, 31 F.4th at 79. Accordingly, we remand for proper application of the treating physician rule. We decline to determine here whether, based on an appropriate application of the rule, Rucker is disabled. We are not prepared to say that there is "no apparent basis to conclude that a more complete record might support the Commissioner's decision." *Butts v. Barnhart*, 388 F.3d 377, 385-86 (2d Cir. 2004); *see also Parker v. Harris*, 626 F.2d 225, 235 (2d Cir. 1980). ("[W]e have reversed and ordered that benefits be paid when the record provides persuasive proof of disability and a remand for further evidentiary proceedings would serve no purpose.") Because we believe that further evidentiary proceedings might be useful, we remand on this issue without conclusively resolving the question of whether Rucker is psychologically disabled.

We turn next to the district court's determination that Rucker's physical limitations do not render her disabled. On this issue, we hold that substantial

evidence supports the ALJ's conclusion that Rucker's physical limitations are not severe enough to include a limitation in her RFC.

To establish a physical impairment, Rucker was required to prove that she had a severe, medically determinable impairment that could be expected to result in death, or that lasted—or could be expected to last—for a continuous period of at least twelve months. 20 C.F.R. §§ 416.920(a)(4)(ii); 416.909. The ALJ concluded that "[al]lthough [Rucker] has body mass index calculations that are consistent with obesity, the record does not show any specific treatment other than recommendations for modification of diet and exercise. There is no evidence that [Rucker's] obesity imposes any limitations on her functional capacity." The ALJ also noted that Rucker's back pain had been treated conservatively and that her physical examinations generated rather benign findings. Substantial evidence supports these conclusions.

Rucker contends that the ALJ improperly discounted Dr. Jenouri's opinion that her physical impairments resulted in "moderate restrictions in walking standing, sitting long periods, bending, stair climbing, lift, and carrying." We disagree. Dr. Jenouri's conclusion contradicted the objective evidence in the record regarding Rucker's minimal treatment history for back pain. The ALJ did

not impermissibly substitute her own expertise for Dr. Jenouri's opinion, but rather she rejected Dr. Jenouri's opinion because she found it was contrary to the record. *See Veino v. Barnhart*, 312 F.3d 578, 588 (2d Cir. 2002). It is well established that an ALJ may set aside an opinion that is contradicted by the weight of other record evidence. *See Snell v. Apfel*, 177 F.3d 128, 134 (2d Cir. 1999). That occurred here. Accordingly, we hold that the ALJ's determination that Rucker was not physically disabled was supported by substantial evidence and we affirm with respect to this conclusion.

## CONCLUSION

For the foregoing reasons, the judgment of the district court is **affirmed in part** and **remanded in part** for further proceedings consistent with this opinion.

MENASHI, *Circuit Judge*, dissenting:

The Social Security Act provides that "[t]he findings of the Commissioner of Social Security as to any fact, if supported by substantial evidence, shall be conclusive." 42 U.S.C. § 405(g). The Supreme Court first described the substantial evidence standard over eighty years ago. "Substantial evidence is more than a mere scintilla," it said, and "means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Consol. Edison Co. v. NLRB*, 305 U.S. 197, 229 (1938).[1] Under the substantial evidence standard, "once an ALJ finds facts, we can reject those facts only if a reasonable factfinder *would have to conclude otherwise*." *Brault v. Soc. Sec. Admin.*, 683 F.3d 443, 448 (2d Cir. 2012) (internal quotation marks omitted).

The court's remand to the agency therefore means that it believes no reasonable person could have made the findings the ALJ did. The court commits two errors on its way to that conclusion. First, the court misreads the ALJ's decision and thereby misstates the ALJ's findings. Second, the court substitutes its own judgment for that of the agency by conducting its own weighing of the evidence. The

---

[1] The Supreme Court elaborated that "substantial evidence" is "enough to justify, if the trial were to a jury, a refusal to direct a verdict when the conclusion sought to be drawn from it is one of fact for the jury." *NLRB v. Columbian Enameling & Stamping Co.*, 306 U.S. 292, 300 (1939); *see also Consolo v. Fed. Mar. Comm'n*, 383 U.S. 607, 620 n.18 (1966) ("Although [*Consol. Edison Co.* and *Columbian Enameling*] were decided before the enactment of the Administrative Procedure Act, they are considered authoritative in defining the words 'substantial evidence' as used in the Act.").

court's analysis is inconsistent with the substantial evidence standard. I would apply that standard and affirm the agency's decision. Accordingly, I dissent.

## I

The court believes that "the ALJ's assessment of Rucker's difficulties with social interactions was not supported by substantial evidence." *Ante* at 9. In the court's telling, the ALJ "did not limit the amount of time that Rucker should spend with co-workers," did not "place any formal limitations on Rucker's interaction with her supervisors," and "apparently concluded that limiting Rucker's interactions with the public would be sufficient." *Id.* at 9-10. The court says that the ALJ's determination "did not factor in" the opinions of medical experts on Rucker's capabilities. *Id.* at 10.

That description differs from the ALJ's actual decision. The ALJ certainly did limit the amount of time Rucker should spend with co-workers. She determined that Rucker "should avoid work requiring more complex interaction or *joint effort* to achieve work goals." Cert. Admin. R. 20 (emphasis added). As an example of appropriate work, the ALJ proposed "work performed *alone* except for normal supervision." *Id.* (emphasis added). She also limited Rucker's interactions with supervisors. The ALJ specified "*normal* supervision" and further explained in her residual functional capacity ("RFC") finding that Rucker "retains the ability to … understand and follow simple instructions and directions" and to "perform simple tasks independently." *Id.* (emphasis added). The ALJ did more than simply limit Rucker's interactions with the public. She decided that Rucker "can have *no* contact with the public." Cert. Admin. R. 20 (emphasis added). All of these findings—regarding limits on Rucker's

2

interaction with co-workers, supervisors, and the public—were communicated to the vocational expert. *Id.* at 60.

A complete description of the ALJ's findings answers the court's objections. The court says that "the ALJ's determination did not factor in Dr. Juriga's conclusion that Rucker is moderately limited in her abilities to … accept instructions and respond appropriately to criticism from supervisors and … get along with coworkers or peers without distracting them or exhibiting behavioral extremes." *Ante* at 10. Yet the ALJ factored in that conclusion when she determined that Rucker "should avoid work requiring complex interaction or joint effort with others" and suggested that Rucker should seek "work performed alone except for normal supervision." Cert. Admin. R. 20. In fact, the ALJ went beyond Dr. Juriga's assessment; Dr. Juriga found that Rucker was only "moderately limited" in her "social interaction limitations," *id.* at 104, but the ALJ explained the RFC finding as "limiting [Rucker] to simple, repetitive work-related stress with *very limited* social interaction," *id.* at 21 (emphasis added). That is how the vocational expert understood Rucker's RFC. As the court acknowledges, the vocational expert identified only jobs that require "the lowest possible level of human interaction in the workplace." *Ante* at 11 (internal quotation marks omitted).

## II

The ALJ's conclusions were supported by substantial evidence. The court acknowledges that the substantial evidence standard "is 'not high.'" *Id.* at 9 (quoting *Colgan v. Kijakazi*, 22 F.4th 353, 359 (2d Cir. 2022)). Even so, it holds that "[s]ubstantial evidence does not support" the ALJ's determinations that "Rucker 'can have normal supervision' but that she should have no contact with the public" and

3

that "there is no diminishment in [Rucker's] ability to work consistently." *Id.* at 9 (quoting Cert. Admin. R. 20)). The court is wrong on both counts.

The administrative record in this case spans 675 pages. It contains "more than a mere scintilla" of "such relevant evidence as a reasonable mind might accept as adequate to support" the ALJ's conclusion that Rucker can interact with a supervisor. *Consol. Edison Co.*, 305 U.S. at 197. Dr. Juriga found that Rucker's "ability to ask simple questions or request assistance" was "[n]ot significantly limited" and that her "ability to accept instructions and respond appropriately to criticism from supervisors" was only "[m]oderately limited." Cert. Admin. R. 104. Dr. Long stated that Rucker "may" have "mild to moderate limitations regarding following and understanding simple directions and performing simple tasks." *Id.* at 394. Rucker's 2017 discharge report indicated that she was "cooperative" and "started interacting with peers." *Id.* at 398. Treatment notes consistently describe Rucker as "cooperative." *Id.* at 481, 487, 493, 499, 505, 511, 523, 529, 535, 547, 556, 565, 588. A reasonable mind *could* accept this evidence as showing that Rucker can handle social interaction consisting solely of "normal supervision." *Id.* at 20.[2] The substantial evidence standard requires no more than that.

_____

[2] Rucker's discharge report from 2016 says that Rucker has reported "struggling" with "managers because she is slow to learn new tasks and needs extra time." Cert. Admin. R. 342. The RFC finding accounts for that limitation. The ALJ determined that Rucker "retains the ability" to "understand and follow *simple* instructions and directions," "perform *simple* tasks independently," "maintain attention and concentration for

There is also substantial evidence that Rucker can maintain regular attendance at a job. As the ALJ noted, "there is no indication that [Rucker] was frequently absent from counseling." Cert. Admin. R. 21. The record shows only that, when a past psychiatrist "told her that she can work," she "got upset and skipped the next appointment." *Id.* at 413. Progress notes—including those written by her treating psychiatrist, Dr. Mirza—consistently describe Rucker's thought processes as "[o]rganized," her concentration as "[f]air" or "good," her impulse control as "fair," and Rucker herself as "[a]lert" and "orientated to time, place and person." *Id.* at 574, 577. Dr. Long noted that Rucker "was able to maintain attention and concentration" and "appears able to maintain a regular schedule." *Id.* at 394. This is more than enough for a reasonable person to conclude that Rucker can regularly show up to work.

The court does not dispute that there is evidence in the record that Rucker could maintain regular attendance at a job. Instead, the court relies on the so-called treating physician rule to say that the ALJ should have adopted Dr. Mirza's mental health questionnaire form. *Ante* at 12-13. That form contains a checkmark indicating a "[m]arked" limitation in Rucker's ability to "[m]aintain regular attendance [w]ithout interruptions from psychological bases [sic] symptoms." Cert. Admin. R. 595. According to the court, the ALJ failed to provide "good reasons" for not treating Dr. Mirza's "opinion"—that single checkmark on a form—as "controlling." *Ante* at 12-13.

---

*simple* tasks," and "handle *simple*, repetitive work-related stress." *Id.* at 20 (emphasis added).

The treating physician rule does not justify the court's departure from the substantial evidence standard. The treating physician rule incorporates the substantial evidence standard and does not override it. The rule is codified in the agency's regulations,[3] which provide that the agency will give "controlling weight" to a "treating source's medical opinion" if that opinion "is well-supported by medically acceptable clinical and laboratory diagnostic techniques *and is not inconsistent with the other substantial evidence in [the] case record*." 20 C.F.R. § 404.1527(c)(2) (emphasis added). This regulation was promulgated in 1991, at which point the definition of "substantial evidence" was at least half a century old and well established. *See Standards for Consultative Examinations and Existing Medical Evidence*, 56 Fed. Reg. 36,932 (Aug. 1, 1991). Moreover, this court has recently explained that "good reasons" are "reasons supported by substantial evidence in the record" and that we will affirm as long as "[o]ur examination of the record discloses that the ALJ … applied the substance of the treating physician rule." *Schillo v. Saul*, 31 F.4th 64, 75, 78-79 (2d Cir. 2022). Because substantial evidence supports the ALJ's finding that Rucker can regularly attend work, the ALJ had

---

[3] The Social Security Administration has repealed the treating physician rule for claims filed after March 27, 2017, because the agency decided that conferring controlling weight on a treating physician's opinion "would be an abdication of [the agency's] statutory responsibility to determine whether the person meets the statutory definition of disability." *Revisions to Rules Regarding the Evaluation of Medical Evidence*, 82 Fed. Reg. 5844, 5856 (Jan. 18, 2017). The current regulation provides that, going forward, the ALJ "will not defer or give any specific evidentiary weight, including controlling weight, to any medical opinion(s)." 20 C.F.R. § 404.1520c(a). Yet because Rucker filed her application in 2016, the agency must follow the older regulation discussed here.

good reasons for not giving Dr. Mirza's checkmark controlling weight.

The ALJ reasonably articulated those reasons. The court criticizes the ALJ for observing that Dr. Mirza's opinion was "based solely on the claimant's reports." *Ante* at 13 (quoting Cert. Admin. R. 21). But in the very next paragraph, the court itself asserts that Rucker "has … poor insight into her mental illness" to criticize the ALJ's reliance on Rucker's denials of psychiatric symptoms. *Id.* at 14 (internal quotation marks omitted). These facts—that Dr. Mirza's psychiatric testing was "based on subjective reports" and that Rucker had "poor insight" into her illness, *id.* at 13-14—could provide a reasonable basis for disregarding Dr. Mirza's opinion, but the ALJ did not even go that far. The ALJ instead gave Dr. Mirza's opinion "limited weight." Cert. Admin. R. 21. That an opinion was "based solely" on the "subjective reports" of someone with "poor insight into her mental illness" surely entitles a reasonable factfinder to give it limited weight. *Ante* at 13-14 (internal quotation marks omitted).

The court further criticizes the ALJ for pointing out Dr. Mirza's note that she was "not able to assess" Rucker's ability to "[a]ccept instructions and respond appropriately to criticism from supervisors" or "[g]et along with co-workers." Cert. Admin. R. 595. But the ALJ did not say that Dr. Mirza could not assess Rucker's mental functioning; she said that Dr. Mirza "acknowledged that she was not able to *fully* assess the claimant's mental functioning." *Id.* at 21 (emphasis added). The court cannot maintain that "the ALJ ignored the context of the notation" when the ALJ said no more than this factually accurate, limited claim. *Ante* at 16 (internal quotation marks omitted).

7

Most revealing is the court's reproach of the ALJ for "stat[ing] that Dr. Mirza's opinion was inconsistent with other evidence in the record." *Id.* According to the court, that was erroneous because the progress reports the ALJ cited "were not uniformly positive." *Id.* The court implies that the ALJ could discount Dr. Mirza's opinion only if it was inconsistent with *all* the other evidence in the record. That gets the substantial evidence standard backwards. "[I]t is up to the agency, and not this court, to weigh the conflicting evidence in the record," *Clark v. Comm'r of Soc. Sec.*, 143 F.3d 115, 118 (2d Cir. 1998), and we must "defer to the Commissioner's resolution of conflicting evidence," *Cage v. Comm'r of Soc. Sec.*, 692 F.3d 118, 122 (2d Cir. 2012). The court is wrong to remand to the agency because the progress reports "were not uniformly positive." *Ante* at 16. It may remand only if the progress reports—and all the evidence in the record—were so overwhelmingly *negative* that no reasonable factfinder could have reached the same conclusion as the ALJ.[4]

"If evidence is susceptible to more than one rational interpretation, the Commissioner's conclusion must be upheld."

---

[4] Because the court believes the evidence in the record of "a pattern of relative calm punctuated by manic episodes was consistent with Dr. Mirza's diagnosis of unspecified bipolar disorder," it criticizes the ALJ for "discount[ing] Mirza's opinion as unsupported by the evidence." *Ante* at 16-17. But the ALJ did not reject Dr. Mirza's diagnosis. Instead, the ALJ assigned limited weight to Dr. Mirza's opinion that Rucker has "[m]arked" limitations in her ability to "[m]aintain regular attendance [w]ithout interruptions from psychological bases [sic] symptoms." Cert. Admin. R. 21, 595. As the ALJ explained in her decision, "[i]n determining whether an individual is disabled, what the impairment is called is of no real consequence" because "[i]t is the impact of the disease, and in particular any limitations it may impose upon the claimant's ability to perform basic work functions, that is pivotal to the disability inquiry." *Id.* at 18.

*McIntyre v. Colvin*, 758 F.3d 146, 149 (2d Cir. 2014). We defer to the agency's determination unless "it is plain that no reasonable fact-finder could make such a[] … ruling." *Xiu Xia Lin v. Mukasey*, 534 F.3d 162, 167 (2d Cir. 2008). In this case, substantial evidence supports the agency's findings, and I would affirm.

## III

If the court believes that no reasonable person could accept the evidence in this case as adequate to support the ALJ's conclusions, it is hard to understand why it remands for "further evidentiary proceedings." *Ante* at 19. We order such proceedings when "there are gaps in the administrative record or the ALJ has applied an improper legal standard." *Rosa v. Callahan*, 168 F.3d 72, 82-83 (2d Cir. 1999) (quoting *Pratts v. Chater*, 94 F.3d 34, 39 (2d Cir. 1996)). But the court here remands for the ALJ to apply the treating physician rule again, *ante* at 19, not for application of a different standard.

Why are we asking the ALJ to re-apply the treating physician rule? The court explains that it is "not prepared to say that there is 'no apparent basis to conclude that a more complete record might support the Commissioner's decision.'" *Id.* at 19 (quoting *Butts v. Barnhart*, 388 F.3d 377, 385-86 (2d Cir. 2004), *amended on reh'g in part*, 416 F.3d 101 (2d Cir. 2005)). We remand for further evidentiary development when we identify a conspicuous absence of evidence in the administrative record—for example, the "fail[ure] to call a vocational expert." *Butts*, 388 F.3d at 386-87. The court identifies no missing evidence in this case. In fact, the court's decision to remand means that it believes the administrative record—675 pages of it— contains enough evidence supporting Rucker's position that no

9

reasonable person could agree with the ALJ. That is not a circumstance in which we would ask the ALJ to add additional pages.

It seems that the court believes the record may already contain substantial evidence to support the ALJ's assignment of limited weight to Dr. Mirza's checkmark opinion. If so, instead of remanding we must conduct "a searching review of the record" to determine whether there is such support—and affirm if we find it. *Estrella v. Berryhill*, 925 F.3d 90, 96 (2d Cir. 2019) (quoting *Halloran v. Barnhart*, 362 F.3d 28, 32 (2d Cir. 2004)). The court "decline[s]" to undertake that review and instead remands to the ALJ for a do-over. *Ante* at 19.

The "judicial review of agency action" is not supposed to be this sort of "ping-pong game." *NLRB v. Wyman-Gordon Co.*, 394 U.S. 759, 766-67 n.6 (1969). Here, the ALJ said that she reached her RFC finding "[a]fter careful consideration of the entire record." Cert. Admin. R. 19-20. There is no reason to doubt the thoroughness of her review or to think that her decision will change after she re-reads the record. *See Brault*, 683 F.3d at 448 (noting that "[a]n ALJ does not have to state on the record every reason justifying a decision" and that "[a]n ALJ's failure to cite specific evidence does not indicate that such evidence was not considered"). The ALJ's decision in this case is clear, but even if it were not, we "must 'uphold' even 'a decision of less than ideal clarity if the agency's path may reasonably be discerned.'" *Garland v. Ming Dai*, 141 S. Ct. 1669, 1679 (2021) (quoting *Bowman Transp., Inc. v. Ark.-Best Freight Sys., Inc.*, 419 U.S. 281, 286 (1974)); *see also Mongeur v. Heckler*, 722 F.2d 1033, 1040 (2d Cir. 1983) ("When, as here, the evidence of record permits us to glean the rationale of an ALJ's decision, we do not require that he have mentioned every item of testimony presented to him or have explained why he considered particular evidence unpersuasive or insufficient to lead him to a

10

conclusion of disability."). That the court is "not prepared" to reject the ALJ's decision is a reason to *affirm* that decision, not to order a re-do. *Ante* at 19.

*      *      *

Our role is "limited to determining whether the [agency's] conclusions were supported by substantial evidence in the record and were based on a correct legal standard." *Cage*, 692 F.3d at 122 (quoting *Lamay v. Comm'r of Soc. Sec.*, 562 F.3d 503, 507 (2d Cir. 2009)). The court departs from that role by mischaracterizing the ALJ's decision and imposing its view of the evidence on the agency. I would instead follow the substantial evidence standard as prescribed by statute, regulation, and our case law. For that reason, I dissent.