In the

# United States Court of Appeals
### For the Seventh Circuit

No. 20-1269

HORTANSIA D. LOTHRIDGE,

*Plaintiff-Appellant,*

*v.*

ANDREW M. SAUL,
Commissioner of Social Security,

*Defendant-Appellee.*

Appeal from the United States District Court for the
Northern District of Indiana, Fort Wayne Division.
No. 1:19-cv-00067-JVB — **Joseph S. Van Bokkelen**, *Judge.*

ARGUED NOVEMBER 17, 2020 — DECIDED JANUARY 5, 2021

Before EASTERBROOK, HAMILTON, and ST. EVE, *Circuit Judges.*

HAMILTON, *Circuit Judge.* Plaintiff Hortansia Lothridge suffers from fibromyalgia, chronic obstructive pulmonary disorder, asthma, hypertension, and several mental-health conditions. After an administrative law judge denied her application for disability benefits, a district judge remanded her case for further explanation of how the ALJ considered

Lothridge's periodic non-compliance with treatments. On remand, the ALJ again denied the application, finding that Lothridge could still perform light work with certain limitations. On judicial review, a different district judge upheld that determination, and Lothridge has appealed.

In assessing Lothridge's impairments at step three of the five-step disability analysis, the ALJ found moderate limitations in concentration, persistence, and pace. In determining her residual functional capacity at step four, however, the ALJ failed to take those limitations into account. This oversight was important because the jobs that the ALJ determined that Lothridge could still perform would require the ability to stay on-task for at least 90% of the workday and would have little tolerance for tardiness or absences. The ALJ made no determination one way or another whether Lothridge is capable of meeting these requirements with her deficits in concentration, persistence, and pace. We therefore vacate the judgment and remand the case to the Commissioner of Social Security.

I.  *Factual Background*

Lothridge applied for disability insurance benefits and supplemental security income in May 2013, when she was about 33 years old. She asserted that she was disabled by fibromyalgia and a host of other physical and psychological problems. Before that, she had worked as a certified nurse aide, a daycare worker, a cashier, and a telemarketer. She had tried to earn her GED after dropping out of high school, but she became frustrated after a week of classes and earned a certified nursing assistant license instead. Hip and back pain caused her to stop working in December 2009.

A. *Treatment History*

The ALJ found that Lothridge's physical impairments limited her to light work, with additional, common limitations regarding climbing, posture, and environmental limits. Lothridge does not challenge the evaluation of her physical abilities. She challenges only the ALJ's assessment of her limitations in concentration, persistence, and pace, so we say little about the physical limitations and her extensive medical history on her physical impairments. We concentrate on her mental-health history.

Before Lothridge stopped working in 2009, she saw a psychiatrist in Nebraska for mood swings, anxiety, lack of focus, and forgetfulness. The psychiatrist noted that Lothridge had poor judgment and diagnosed her with mood disorders, attention deficit disorder, and bipolar I disorder. She also prescribed medication. Lothridge's treatment and prescriptions lapsed, however, because she was in and out of the state with her family.

After Lothridge settled with her husband in Indiana, her sister took her to a family doctor, Dr. Marilyn Whitney, to re-establish care in October 2012. At her initial appointment, Lothridge reported pain "all over my body" and multiple psychiatric issues, including depression, anxiety, and paranoia. Later she complained of continuing pain and excessive sleeping. Dr. Whitney eventually diagnosed several chronic conditions, including fibromyalgia, and prescribed medication to control them.

In August 2013, Lothridge sought mental-health counseling. At a screening appointment, she reported panic attacks, sleep disturbances, anger, depression, anxiety, and

chronic pain that affected her moods. She reported that she was a victim of childhood sexual abuse and thought about suicide, though she had no active plans. She was afraid to be alone or to drive alone, but she often self-isolated. A clinician diagnosed bipolar I disorder and learning disabilities and assessed significant problems with decision-making, moderate problems with social functioning, and problems with remote memory. Observing that Lothridge struggled with taking her medication and did not understand or know how to manage her symptoms, the clinician referred Lothridge for in-home therapy.

Over the next two months, as Lothridge's disability-benefits application was being processed, two agency doctors reviewed her file. Dr. Richard Wenzler, an internist, noted that she had affective disorders and believed that her allegations about the intensity, persistence, and limiting effects of her impairments were substantiated by medical evidence. Ultimately, though, he concluded that the record lacked sufficient evidence to determine whether Lothridge was disabled. Similarly, psychologist Dr. F. Kladder said the evidence was not sufficient to draw conclusions about the severity of her mental limitations.

In October, agency psychologist Dr. Glenn Davidson conducted a mental-health examination. Lothridge arrived late after calling the office twice for directions, and her cousin accompanied her because she was afraid to drive alone. (She had missed three prior appointments because she had confused the times.) Lothridge said that she lived with her children and did "some little bit of housework" but otherwise "didn't go anywhere or do anything." Dr. Davidson noted that she suffered from anxiety, depression, and chronic pain.

Her long-term memory seemed intact, but she had trouble with immediate memory. She could not retain number sequences beyond four digits forward and had problems with delayed recall. Dr. Davidson diagnosed mood disorder and post-traumatic stress disorder. He gave her a Global Assessment of Functioning (GAF) score of 60, signaling moderate difficulties with social and occupational functioning. See Diagnostic and Statistical Manual of Mental of Mental Disorders 34 (4th Ed. Text Rev. 2013).

A month later, in November 2013, Lothridge began in-home mental-health therapy with psychiatric nurse practitioner Tamara Reynolds. Lothridge was sad and irritable, displayed a flat affect, struggled to maintain eye contact, and cried or giggled when she was asked questions. Reynolds noted that Lothridge's memory was poor and that she suffered from paranoia, depression, suicidal ideas, flashbacks, agoraphobia, mood swings, and episodes of elation accompanied by memory loss. Reynolds diagnosed bipolar I disorder, depression, and post-traumatic stress disorder, and she prescribed antidepressants and medication for attention deficit disorder. She also checked a box indicating that Lothridge had "significant functional impairment" in the areas of daily living, interpersonal functioning, adapting to change, occupational functioning, and concentration, persistence, and pace. Reynolds also noted that Lothridge had moderate problems with focus.

In early 2014, agency psychologist Dr. Donna Unversaw re-evaluated Lothridge's records and opined that she had memory limitations, social-interaction limitations, and sustained limitations in concentration and pace. Nonetheless, she believed, Lothridge had the mental capacity to:

understand, remember, and carry-out simple
tasks; … relate on at least a superficial basis on
an ongoing basis with co-workers and
supervisors; … attend to task for sufficient
period of time to complete tasks; … [and]
manage the stresses involved with work.

In the meantime, Lothridge continued seeing Dr. Whitney,
who documented continuing complaints of pain, depression,
and anxiety, and who noted that Lothridge had begun to
suffer from migraines. Dr. Ehlich, a rheumatologist who was
treating Lothridge's fibromyalgia, noted in 2014 that, in
addition to diffuse pain, Lothridge had headaches,
depression, anxiety, fatigue, and cognitive impairments.
Despite her compliance with treatment, he observed, her
condition was worsening. In April 2015, he wrote a note
saying that she would be unable to work for at least the next
year.

Another agency doctor, internist Dr. Xavier Laurente,
examined Lothridge in August 2015. She was then taking
antidepressants and anticonvulsants for fibromyalgia and
ibuprofen for headaches. Beyond his findings about
Lothridge's physical health, Dr. Laurente indicated that
Lothridge could not travel without a companion or use public
transportation, but that she could shop and handle her
personal hygiene and finances.

Over the next year, Lothridge struggled to comply with
her treatment. She missed several appointments with her
family doctor. She temporarily stopped taking all her
medicine because she said it made her drowsy and she feared
it would kill her.

In March 2016, nurse practitioner Reynolds documented poor concentration, panic attacks, depression, and irritability. Lothridge was trying to address her stressors, Reynolds noted, but she showed limited progress in applying coping skills. In the following months, Lothridge's depression worsened. She struggled to get out of bed, to complete her personal hygiene, and to clean her home. When Reynolds told Lothridge that her therapy program would end in May of the next year, she became distressed because she did not have a driver's license to attend in-person sessions. On Reynolds's advice, she applied to her clinic for intensive case management services but was denied.

At a February 2017 appointment, Dr. Whitney observed that Lothridge appeared bewildered and demonstrated poor judgment, so she recommended ongoing psychiatric follow-ups. Later, in November 2017, Lothridge attempted to restart mental-health therapy. At a walk-in appointment, she sat in the far corner of the room and faced the wall. She reported chronic pain, fear of medication, flashbacks, trouble connecting with others, and difficulty remembering events. A clinician assessed a moderate degree of self-care impairment, difficulty with decision-making, impaired social function, and challenges with concentration. Further, Lothridge tended to self-isolate, suffered from frequent panic attacks, and sometimes could not get out of bed because of pain and depression. She also had difficulties caring for her children.

B. *Procedural History*

An ALJ held a hearing on Lothridge's disability claim in June 2015. Lothridge, who was accompanied by family, testified that she struggled with pain in her hands, shoulders, back, and hips. She could not remember all the medications

she was taking. They dulled the pain but did not take it away completely. She was able to shop sometimes but had to take her children with her and often left mid-task when she was overwhelmed. It took her six or seven attempts to pass her driver's test. Her children did most of the housework and, when she sometimes supervised, she had to take frequent breaks.

In September 2015, the ALJ found that Lothridge was not disabled within the meaning of the Social Security Act. Lothridge sought review in the district court, and Judge Springmann remanded the case with instructions to the ALJ to develop the record regarding Lothridge's gaps in treatment and to explain the weight given to her treating sources.

In September 2018, Lothridge appeared for a second hearing before the same ALJ, again accompanied by family. She testified about her gaps in mental-health treatment, explaining that she had a "mixed" relationship with providers. She had trusted Reynolds but struggled to find another therapist after Reynolds left her clinic. Lothridge struggled to attend in-person appointments because she forgot the times and could not find transportation. Though she had regained her driver's license after a temporary suspension, driving was painful, and she was afraid to be on the road. (She had to pull over a few times on the way to the hearing despite having a companion.) And she said had stopped taking some of her medications for a while because she thought they would kill her. She had not been able to cook for years and struggled to complete simple household tasks. She had a dog, but her children took care of it. She depended more and more on her children, who took care of themselves, and she could not go anywhere without them. She was in pain

throughout the hearing and, though she stayed for the duration, she needed to have several questions repeated. The ALJ ultimately found, however, that objective evidence was not consistent with Lothridge's account of the severity and intensity of her symptoms and impairments.

A vocational expert testified about jobs Lothridge could perform with her functional limitations. See 20 C.F.R. § 416.960(b)(2). With respect to mental limitations, the ALJ directed the expert to assume a person with Lothridge's age, education, and work experience who could:

> understand, remember, and carry-out simple instructions and tasks. She can make judgments on simple work-related decisions. She can respond appropriately to occasional interactions with supervisors and coworkers [but] should avoid interactions with the general public. She can respond appropriately to usual work situations, and she can deal with routine changes in a routine work setting.

The expert opined that, with these restrictions and her physical limitations, Lothridge could work as a garment sorter, mail clerk, or photocopy machine operator. But the expert added that an employee who needed help leaving for breaks or lunch could not retain these jobs, and late arrivals and early departures would not be tolerated. The hypothetical worker would also need to be on-task at least 90% of a workday and could be absent only once a month.

Applying the familiar five-step analysis set forth in 20 C.F.R. § 404.1520, the ALJ again found that Lothridge was not disabled. She concluded that Lothridge suffered from several

severe mental impairments, including bipolar I disorder, depressive disorder, mood disorder, anxiety disorder, obsessive-compulsive disorder, post-traumatic stress disorder, and attention deficit hyperactivity disorder. Critically, the ALJ found that these impairments caused moderate limitations in understanding and applying information, interacting with others, and maintaining concentration, persistence and pace. But Lothridge could do basic arithmetic and had some friends, the ALJ reasoned, and she still drove, shopped in stores, and cared for herself and her family. Without further elaboration, the ALJ adopted the mental residual functional capacity that she had posited to the vocational expert. From there, the ALJ adopted the vocational expert's conclusion that, although these limitations prevented Lothridge from returning to the jobs she held in the past, there were still plentiful positions she could perform despite them. The Appeals Council denied review. Lothridge sought judicial review, and a different district judge, Judge Van Bokkelen, affirmed the denial of benefits in December 2019.

II.  *Analysis*

We review an ALJ's decision to determine if it is supported by substantial evidence—evidence a reasonable mind might accept as adequate to support a conclusion. See 42 U.S.C. § 405(g); *Biestek v. Berryhill*, 139 S. Ct. 1148, 1154 (2019).

Lothridge's principal argument is that the ALJ, in assessing her residual functional capacity, did not account for her difficulties with concentration, persistence, and pace. Lothridge points to considerable evidence that she has problems with concentration and memory and poor coping skills, that she needs frequent breaks, that she sometimes cannot get out of bed because she is depressed and fatigued,

and that she struggles to care for herself. Despite recognizing some of these challenges, Lothridge says, the ALJ failed to account for them sufficiently in assessing her functional limitations. We agree.

The ALJ need not use any "magic words" in formulating a person's residual functional capacity, often called an RFC. *Crump v. Saul*, 932 F.3d 567, 570 (7th Cir. 2019). But an "RFC assessment must incorporate all of the claimant's limitations supported by the medical record, including even moderate limitations in concentration, persistence, or pace." *Id.* (internal citations omitted). We have repeatedly cautioned that "someone with problems concentrating might not be able to complete a task consistently over the course of a workday, no matter how simple it may be." *Martin v. Saul*, 950 F.3d 369, 373–74 (7th Cir. 2020) (collecting cases).

In Lothridge's case, the residual functional capacity finding is not supported by substantial evidence in this one important respect. First, the finding appears inconsistent with the ALJ's earlier assessment of Lothridge's "moderate" limitations in concentration, persistence, and pace. Under different circumstances, such an inconsistency may not be fatal. But at step three of the disability analysis, in addressing the so-called "listed" disabilities, see 20 C.F.R. Part 404, Subpart P, App. 1, the ALJ acknowledged that Lothridge only "sometimes finished what she started," "got frustrated easily," "did not handle stress well," and had "some challenges with concentration"—even that she was distressed during the hearing and needed to have questions repeated.

Yet the ALJ's step-four finding on her residual functional capacity a few pages later contained no corresponding restrictions. It limited Lothridge to "simple instructions and

tasks with restricted interactions with others" without addressing her ability to stay on task for a full workday or to perform at the required speed. Cf. *Martin*, 950 F.3d at 374 (residual functional capacity that discussed claimant's ability to "meet production requirements" and need for flexibility adequately captured limitations with concentration, persistence, and pace). The ALJ's formulation here says nothing about whether Lothridge is capable of performing work at a sustained pace over an entire workday. The vocational expert seemed to recognize as much when she clarified during the hearing, without prompting from the ALJ, that a hypothetical worker with Lothridge's other limitations would need to remain on task for 90% of the workday to be employable. The ALJ's decision, however, did not address one way or another whether Lothridge could meet those requirements.

"The law does not require ALJs to use certain words, or to refrain from using others, to describe the pace at which a claimant is able to work." *Martin*, 950 F.3d at 374. Nevertheless, the residual functional capacity analysis must say enough to enable a review of whether the ALJ considered the totality of a claimant's limitations. See *Crump*, 932 F.3d at 571. The ALJ acknowledged here that Lothridge "had difficulty with some areas of understanding and remembering," but the ALJ also said that further restrictions were not warranted because Lothridge was "generally cooperative" and "able to do simple arithmetic." This reasoning fails to build the required "logical bridge" between evidence and conclusion. See, e.g., *Villano v. Astrue*, 556 F.3d 558, 562 (7th Cir. 2009). Whether Lothridge is congenial or able to add sums in a short-term encounter or examination

has little or no apparent bearing on whether she can maintain pace or stay on task for an entire workday.

It is not a court's role to displace an ALJ's judgment by making our own findings about the facts, but we cannot uphold an administrative determination that failed to explain the outcome adequately. *Parker v. Astrue*, 597 F.3d 920, 921 (7th Cir. 2010). To put it another way, an internally inconsistent opinion by an ALJ is likely to fail to build a logical bridge between the evidence and the result. Dr. Unversaw's opinion might have supported the limited restrictions, but the ALJ chose to accord it "little to no weight." The ALJ's findings about the jobs Lothridge could perform needed to account in a meaningful way for the earlier findings that recognized her difficulties with concentration, completing tasks, and managing stress. See *Crump*, 932 F.3d at 571.

As we read the decision, the ALJ also cherry-picked and overstated the evidence that she cited to support her residual functional capacity finding. The ALJ emphasized, for example, Lothridge's admissions in a subjective function report that she could drive, care for her children and pets, prepare meals, dress and groom herself, and shop. Yet the ALJ overlooked, or at least did not acknowledge and engage with, the limitations with those tasks that Lothridge included in that same report—such as the pain and fatigue those activities caused her, her need for frequent breaks, and her dependence on her children for daily living activities (including shopping, personal hygiene, and caring for pets). See, e.g., *Craft v. Astrue*, 539 F.3d 668, 680 (7th Cir. 2008) (remanding because ALJ ignored claimant's qualifications "as to *how* he carried out [daily living] activities"). What's more, that report was submitted before Lothridge's first hearing. Later medical

records and testimony suggested that her symptoms were becoming worse and that her work-related limitations were increasing. The ALJ also did not reckon with Dr. Ehlich's documentation of Lothridge's persistent cognitive difficulties, headaches, fatigue, depression, and anxiety, which were consistent with her fibromyalgia diagnosis. Nor did she mention nurse-practitioner Reynolds's many assessments that Lothridge had poor concentration, major functional limitations, and a declining ability to care for herself, despite the intensive nature of that treatment relationship. An ALJ need not address every piece of evidence, but she may not ignore entire swaths of it that point toward a finding of disability. *Denton v. Astrue*, 596 F.3d 419, 425 (7th Cir. 2010).

We are not persuaded by the Commissioner's arguments in defense of the ALJ's decision. First, the Commissioner argues that Lothridge demands a categorical rule to the effect that an ALJ may never accommodate "moderate" limitations in concentration, persistence, and pace with only a restriction to simple instructions and tasks. We have explained already that there is no such rule. Lothridge certainly emphasizes the need for more restrictions based on the ALJ's "moderate" rating. But she also faults the ALJ for failing to evaluate how long she could remain on task and perform at speed, despite finding deficits in those areas.

Second, the Commissioner argues that Lothridge failed to identify which additional limitations were supported by the record. As the vocational expert testified, however, for Lothridge to be employable, she would need to be able to stay on task for at least 90% of the workday and to have minimal tardiness and only one absence per month. The ALJ neither cited evidence that Lothridge could meet these benchmarks

nor addressed the evidence that she could not. See *Winsted v. Berryhill*, 923 F.3d 472, 477 (7th Cir. 2019). The Commissioner proposes that the ALJ implicitly rejected that evidence by imposing no limitations beyond restricting Lothridge to simple tasks and decisions. But this attempt to supply a post-hoc rationale for the ALJ's decisive findings runs contrary to the *Chenery* doctrine. See *SEC v. Chenery Corp.*, 318 U.S. 80, 87–88 (2010); *Parker*, 597 F.3d at 922. The record also contains evidence of additional limitations—such as a need for frequent breaks and accommodations for poor concentration and focus—that the ALJ was obliged to consider. See *Young v. Barnhart*, 362 F.3d 995, 1002–03 (7th Cir. 2004). From her decision, we are unable to ascertain whether she did. A second remand is therefore needed.

Finally, Lothridge also argues that the ALJ erred by using her non-compliance with treatment as evidence against the severity of her symptoms. She argues that the ALJ should have recognized that her non-compliance could be caused by, or a symptom of, her mental illnesses. The ALJ discussed the conservative nature of Lothridge's treatment and her periodic non-compliance with it, as directed by Judge Springmann's original remand. We do not read the ALJ's second denial decision as drawing any negative inferences about Lothridge's credibility on that basis. Rather, the ALJ concluded that the evidence did not support Lothridge's testimony and statements about the severity and intensity of her symptoms "regardless of adherence to treatment." Specifically, the ALJ cited "the medical evidence and her reported activities of daily living" as the reasons she did not believe Lothridge's symptoms were disabling. The ALJ's discussion of noncompliance is not crystal clear, but we do

not read it as suffering from this second error that Lothridge assigns.

In sum, the ALJ denied benefits based on finding a residual functional capacity that did not account for Lothridge's significant mental limitations that the ALJ had already identified. We therefore VACATE the district court's judgment and REMAND with instructions to remand to the Commissioner for further proceedings consistent with this opinion.