In the

# United States Court of Appeals
## For the Seventh Circuit

_____

No. 24-1461

FERIDA H. MOY,

*Plaintiff-Appellant,*

*v.*

FRANK BISIGNANO, Commissioner of Social Security,

*Defendant-Appellee.*

_____

Appeal from the United States District Court for the
Northern District of Illinois, Eastern Division.
No. 1:22-cv-06341 — **Sunil R. Harjani**, *Judge.*

_____

ARGUED DECEMBER 6, 2024 — DECIDED JULY 2, 2025

_____

Before HAMILTON, SCUDDER, and LEE, *Circuit Judges.*

HAMILTON, *Circuit Judge*. Plaintiff Ferida Huskic Moy suffers from severe post-traumatic stress disorder (PTSD) resulting from her harrowing experiences during the brutal wars in the 1990s as the nation of Yugoslavia was breaking up. She applied for disability insurance benefits and supplemental security income based on her PTSD and related mental health issues. Moy's application was denied after an administrative law judge (ALJ) found that she had the

residual functional capacity to perform work involving simple, routine tasks with minimal contact with supervisors and co-workers. That determination was upheld by the district court, and Moy has appealed.[1]

When assessing Moy's residual functional capacity, the ALJ found that Moy had "moderate limitations in concentrating, persisting, or maintaining pace." He then wrote that, to "account for moderate limitations in concentrating, persisting or maintaining pace, I provided that she *can* work at a consistent production pace." AR 21 (emphasis added). We see this as a non-sequitur: to accommodate Moy's moderate limitations, the ALJ treated her as if she were unlimited in those respects. There was no logical bridge between the noted limitations and the residual functional capacity conclusion. Accordingly, we vacate the judgment and remand the case to the Commissioner of Social Security.

I.  *Background*

    A.  *Factual Background*

Moy grew up in what is now Bosnia and Herzegovina. She survived the conflicts that tore Yugoslavia apart in the early 1990s and eventually made her way to the United States. She worked various jobs in the United States before the alleged onset of her disability in June 2020, including as a bakery assistant, deli associate, line cook, server assistant, and most recently as a sales associate at a Home Depot store. Until June

---

[1] When this case was filed in the district court, the parties jointly consented to have then-Magistrate Judge Harjani conduct all proceedings in the case, including entering final judgment. See 28 U.S.C. § 636(c)(1). After entering judgment in this case, Judge Harjani was appointed as a district judge.

2020, there was nothing unusual in Moy's medical records, at least as relevant to this appeal. In February 2019, she began seeing Dr. Sonia Abraham, a primary care doctor. At that time, Moy was "negative" for anxiety and depression.

On June 11, 2020, Moy reported to a hospital's emergency department complaining of dull chest pain. She was discharged but returned the next day for a cardiology appointment and fainted while sitting in a chair. Medical reports indicate that she had been "anxious and crying earlier in the day" and that she was lethargic after the fainting episode. Her cardiology exams were unremarkable, and she was again discharged.

Things got worse from there. Several days later, Moy saw Dr. Abraham to follow up on the hospital visit. Moy's chest pain had not returned, but she reported feeling "traumatized" from being in concentration camps in Bosnia. Moy also told Dr. Abraham that this experience was "causing stress" and making her feel numb. Dr. Abraham recommended that Moy see a psychiatrist for stress and started her on an antidepressant and anti-panic medication called Alprazolam.

The next day, June 17, Moy began seeing a therapist, Dani Avallone. Moy described hallucinations, depression, and anxiety related to "the war in Bosnia." Avallone diagnosed Moy with PTSD. The record indicates that around the time Moy began experiencing these debilitating PTSD symptoms, she also began to struggle at work. One note indicated that when Moy went to work, she had panic attacks during which she would forget some of her English. AR 514. That document also reflected Moy's belief that a co-worker was "trying to get her terminated," and another note reported that a co-worker "betrayed her" in an incident apparently related to a forklift.

AR 514, 516. Avallone's treatment notes indicate that Moy's
PTSD was severe: Moy was "continually getting flashbacks of
when she and her children were in a concentration camp,"
and she "keeps hearing children screaming[,] bullets fired."
AR 518. Another noted that Moy arrived for one treatment
session "crying, sobbing, stating she had not slept because she
keeps reliving the sight of her father's head being cut off." AR
520. Avallone saw Moy until July 4, 2020 and consistently re-
ported that she had a depressed, anxious mood, though she
presented appropriately and was oriented to time and place.

Around the time Moy stopped seeing Avallone, she began
seeing Dr. Amr Kireem. After treating Moy for two weeks, Dr.
Kireem quickly concluded that she was "not fit physically and
mentally to bear any responsibility at her workplace effec-
tively and efficiently." He therefore recommended that Moy
stay away from work for "at least the next two weeks." In Oc-
tober 2020, Dr. Kireem responded to a Mental Impairment
Questionnaire in support of Moy's disability claim. He re-
plied that Moy could not "work at all." In a comparable report
from the same time, Dr. Abraham likewise wrote that Moy
had "extreme PTSD," anxiety, depression, and hallucinations
that limited her ability to work.[2]

Moy saw Dr. Kireem for a little more than one year. Our
review of the record shows that Dr. Kireem treated Moy

---

[2] Moy also started seeing a cardiologist, Dr. Saifullah Nasir, around
the same time she started seeing Dr. Kireem. Dr. Nasir also diagnosed
PTSD, depression, and anxiety, and he prescribed an antidepressant and
anti-anxiety medication called Escitalopram. In early September, Dr. Nasir
noted that Moy "continue[d] to have significant anxiety" but said that the
medication was helping. Nonetheless, he said that Moy would be "unable
to talk to customers" and recommended that she take time off from work.

approximately 35 times between July 1, 2020 and July 31, 2021. Several reports are of particular note. In October 2020, Dr. Kireem submitted a separate response to the Social Security Administration on Moy's behalf. In that report, he wrote that Moy was unable "to even see people in the street without having emotional outburst, anger, and physical pain. She cannot interact with other employees or customers in a socially reasonable fashion. Besides, she consistently sees people covered in blood." AR 583. He noted that Moy's PTSD symptoms were the most severe he had ever seen. AR 588. In a later treatment session with Dr. Kireem, Moy described "seeing a man with a beard behind her most of the time that no one else sees." AR 1099. She also reported feeling "scared all the times (sic) and cannot go outside especially to crowded places." In treatment sessions from around the same time, Moy described sleep paralysis and auditory and visual hallucinations. On July 27, 2021—apparently the last time Moy saw him—Dr. Kireem wrote that Moy did not show "any symptoms of improvement, however, she has been attending therapy to maintain her sanity." AR 1132. He again said that Moy should see a psychiatrist.

In September 2020, early in the year during which Moy did therapy with Dr. Kireem, she returned to Dr. Abraham with a complaint of increased depression. Treatment notes from that appointment reflect that Moy was crying and experiencing "memories of the war." AR 563. Moy also said that her antidepressant was not working, and she reported taking double the recommended dosage.

In early 2021, Moy received treatment for several medical issues unrelated to her disability claim. While Moy does not claim disability based on these other medical issues, the

reports list the medications she was taking. Around June 1, 2021, Moy was taking Escitalopram, Alprazolam, Propranolol, and Trazodone at least daily. These documents also reported Moy's PTSD and anxiety diagnoses but indicated that she did not display any evidence of "emotional or behavioral disorder." AR 825–26; 828 (cleaned up).

B.  *Procedural Background*

Moy filed an application seeking Social Security disability benefits on August 5, 2020. She asserted her disability began on June 11, 2020—the day of her initial hospital visit described above. Moy's claims were denied initially, on reconsideration, and—after a telephonic (not video) hearing—in a written decision. In the hearing, Moy testified through an interpreter. She told the ALJ through an interpreter that she had been hallucinating a "killer from 1992" and "blood from [her] father." AR 41. Moy testified that she stopped working at Home Depot because she "started to see blood on people." AR 44. And in an exchange worth reproducing in full, Moy also testified that a killer named Milan Urusich—apparently a co-worker, or a person she was confusing with a co-worker—was creating problems for her at work:

> ALJ:  Your record says that you believed some-one was trying to get you fired.
>
> Moy:  That was the case, that someone was pushing me from behind. That was Milan Urusich (phonetic).
>
> ALJ:  I'm sorry. Could you repeat that?
>
> Moy:  That was when someone was pushing me from behind. His name was Milan Urusich.

> ALJ: Could she please describe what she means by pushing her from behind?
>
> Moy: He was pushing me from behind. I was driving a forklift with Scott, and Milan came and turned off my forklift. And Scott helped me to turn this forklift back on. And I was afraid because Milan killed my father. He was always behind me.

AR 44. When asked about her mental health symptoms, Moy said: "I see killer from 1992 … I see blood from my father. I cannot fight these pictures." She was crying during the hearing.

To help determine whether Moy could work, the ALJ posed several hypothetical questions to a vocational expert. The ALJ first asked whether, in the expert's opinion, a person with Moy's limitations and an ability to work at a "consistent production rate" could perform any of Moy's past jobs. The expert responded that the only possibilities would be "dining room attendant" or "bus person," because those do not involve "communicating with the general public." AR 50. The expert also opined that such a person could also work as a scrap sorter, industrial cleaner, or dishwasher. AR 50–51. The ALJ then asked, "what would those jobs allow in terms of absences, off-task tolerances, and breaks?" The vocational expert responded:

> Certainly someone could be absent for two or more days without medical excuse. But if this is a regular occurrence occurring every month where a person is absent, tardy, or leaving early two or more days a month regularly, then

they're not a reliable worker and eventually they'll lose their employment. … [I]f someone is off-task 15% of the work day, which is about eight minutes every hour or more, … there'd be no work for this person.

AR 51–52.

The ALJ issued a written decision applying the familiar five-step analysis set forth in 20 C.F.R. § 404.1520(a)(4) and concluding that Moy did not meet the stringent standard for disability under the Social Security Act. At step one he concluded that Moy had not engaged in substantial gainful activity since her alleged disability onset date. At step two he concluded that Moy suffered from several severe impairments including depression, anxiety, and PTSD. At step three, the ALJ concluded that Moy's impairments did not meet or equal an automatically disabling impairment listed in 20 C.F.R. Part 404, Subpart P, App. 1; see also 20 C.F.R. § 404.1520(d).

The ALJ then determined Moy's residual functional capacity, i.e., her capacity to work notwithstanding her impairments. He concluded that Moy could work at "all exertional levels" but with limitations, including without driving, operating moving machinery, working at heights, climbing, working in direct public service, working in "crowded, hectic environments," or engaging in "tandem" tasks. The ALJ also concluded that, notwithstanding "moderate limitations" in concentrating, persisting, or maintaining pace, Moy could work at "consistent production pace." Citing the vocational expert's testimony, the ALJ concluded at steps four and five that Moy could perform her past work as a "dining room attendant/bus person," and that she could also work as a scrap sorter, industrial cleaner, or dishwasher.

The Appeals Council denied review of Moy's claim. Moy then sought judicial review in the Northern District of Illinois. That court affirmed the ALJ's denial of benefits. This appeal followed.

## II. *Standard of Review*

We review de novo a district court's decision affirming an ALJ's denial of Social Security disability benefits, *Deborah M. v. Saul*, 994 F.3d 785, 788 (7th Cir. 2021), but we review the ALJ's decision deferentially, affirming if its conclusions are supported by substantial evidence. 42 U.S.C. § 405(g); *Deborah M.*, 994 F.3d at 788; *Clifford v. Apfel*, 227 F.3d 863, 873 (7th Cir. 2000) (ALJ's residual functional capacity determination "must be supported by substantial evidence in the record"). Substantial evidence is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Biestek v. Berryhill*, 587 U.S. 97, 103 (2019), quoting *Consolidated Edison Co. v. NLRB*, 305 U.S. 197, 229 (1938). While we do not reweigh evidence, we conduct a critical review because a decision "cannot stand if it lacks evidentiary support or an adequate discussion of the issues." *Lopez ex rel. Lopez v. Barnhart*, 336 F.3d 535, 539 (7th Cir. 2003). In addition, an ALJ must "build an accurate and logical bridge from the evidence to his conclusion." *Clifford*, 227 F.3d at 872. That logical bridge can assure a reviewing court that the ALJ considered the important evidence and applied sound reasoning to it. See *Hickman v. Apfel*, 187 F.3d 683, 689 (7th Cir. 1999).

## III. *Analysis*

We conclude that the ALJ's determination of Moy's residual functional capacity failed to account for her limitations related to concentration, persistence, and pace. Specifically, the

ALJ wrote: "To account for moderate limitations in concentrating, persisting, or maintaining pace, I provided that [Moy] can work at a consistent production pace." AR 21. The problem is that this provision—supposedly to account for Moy's limitations—does not reflect any level of functional limitation. Accordingly, we must reverse and remand.

"[O]n several occasions in recent years we have addressed the role [concentration, persistence, and pace] limitations must play in a proper [residual functional capacity] determination." *Crump v. Saul*, 932 F.3d 567, 570 (7th Cir. 2019). We have emphasized that "both the hypothetical posed to the [vocational expert] and the ALJ's [residual functional capacity] assessment must incorporate all of the claimant's limitations supported by the medical record," including limitations in concentration, persistence, or pace. *Varga v. Colvin*, 794 F.3d 809, 813 (7th Cir. 2015), quoting *Yurt v. Colvin*, 758 F.3d 850, 857 (7th Cir. 2014).

Here, the ALJ first asked the vocational expert whether a person with a wide range of limitations—including inability to drive, operate machinery, communicate complex ideas in English, make complicated decisions, adapt to frequent changes in work process or product, engage with the public, or engage in more than "brief and superficial" interaction with co-workers—could nonetheless work. That question explicitly included an ability to work at a "consistent production rate." AR 49. The vocational expert testified that such a person could work—but was later asked what the employers would tolerate in terms of "absences, off-task tolerances, and breaks." The expert responded that if an employee were regularly absent or tardy or left early for two or more days per month, that person would "lose their employment." AR 52.

He also explained that if an employee were "off-task 15% of the work day, which is about eight minutes every hour or more, … there'd be no work for this person." *Id*.

We emphasize that the ALJ fulfilled his obligation to ensure the vocational expert was "apprised fully of the claimant's limitations" so the expert could offer a reliable opinion about jobs the claimant could perform. See *Crump*, 932 F.3d at 570, quoting *Moreno v. Berryhill*, 882 F.3d 722, 730 (7th Cir. 2018); *O'Connor-Spinner v. Astrue*, 627 F.3d 614, 619 (7th Cir. 2010) (collecting cases: "Our cases generally have required the ALJ to orient the [vocational expert] to the totality of a claimant's limitations." (footnote omitted)). By first asking a hypothetical question that included all the limitations the ALJ would later incorporate into the written residual functional capacity determination, the ALJ ensured that the vocational expert had the information necessary to opine on Moy's ability to work. The ALJ then asked a key follow-up question: whether a person with Moy's functional limitations could work if her symptoms required her to be absent or off-task on a regular basis. Moy's attorney was satisfied with the expert's negative answer. He declined to ask any further questions and told the ALJ that he "covered it with 15% [off-task time] or two days absenteeism." AR 52.

The problem, though, is that the ALJ's residual functional capacity determination did not adequately account for Moy's limitations in concentration, persistence, and pace—limitations the vocational expert acknowledged would impede a claimant's ability to work. The ALJ found that Moy had limitations in her ability to concentrate, persist, and maintain pace, noting that Moy alleged "difficulty focusing," reported "flashbacks and hallucinations," and demonstrated

"distractible attention during psychotherapy visits." AR 17. Perhaps the ALJ might have concluded that, despite these limitations, Moy could nonetheless stay on-task and regularly attend work in a way that would not interfere with her employment. But that was not his reasoning. Instead, "to account" for Moy's limitations, the ALJ concluded that she could work at a "consistent production pace"—which we understand to say that, to account for Moy's limitations, he imposed no additional restrictions. This reasoning fails to build a logical bridge between the limitations found and the residual functional capacity conclusion. See *Lothridge v. Saul*, 984 F.3d 1227, 1233–34 (7th Cir. 2021) (remanding when ALJ noted limitations in concentration, persistence, and pace but said that further residual functional capacity restrictions were not warranted: "an internally inconsistent opinion by an ALJ is likely to fail to build a logical bridge between the evidence and the result").

Because of this discrepancy, we agree with Moy that the ALJ failed to account for her functional limitations related to concentration, persistence, and pace. *Crump* illustrates why. There, the ALJ first asked a vocational expert about the availability of work for a person who could "perform simple, repetitive tasks without incorporating any [concentration, persistence, or pace] limitations." 932 F.3d at 570–71. The ALJ then asked whether a person who was "off-task 20% of the time" or required two unscheduled absences per month could work. The expert responded that such a person would be unable to sustain employment—just as the expert testified in this case. We ultimately reversed the ALJ's denial of benefits. We explained that, because the ALJ failed to incorporate the vocational expert's second response in his residual functional capacity determination, that determination was "altogether

uninformed by considerations of off-task time or unplanned leave." *Id.* at 570. As in this case, the ALJ rooted the residual functional capacity determination in the vocational expert's first opinion—which "by its terms, did not account" for the claimant's limitations. *Id.* at 571, citing *Winsted v. Berryhill*, 923 F.3d 472, 477 (7th Cir. 2019) ("Because the ALJ did not include Winsted's difficulties with concentration, persistence, and pace in the hypothetical he *did* consider, the decision cannot stand."). In both *Crump* and this case, the ALJ's determination of the claimant's ability to work should have been guided by the second hypothetical question posed by the ALJ, which incorporated attendance and attention limitations. Accord, *Lothridge*, 984 F.3d at 1233 (remanding when ALJ noted limitations but failed to incorporate them into residual functional capacity determination); cf. *Martin v. Saul*, 950 F.3d 369, 374 (7th Cir. 2020) (rejecting concentration, persistence, and pace argument when ALJ tailored claimant's residual functional capacity to the noted limitations).

The Commissioner argues that we should affirm the ALJ's decision not to include any residual functional capacity restrictions despite finding persistence-related limitations because the ALJ relied on opinions from state agency medical consultants who concluded that Moy had "no difficulty concentrating sufficiently for a normal work period." AR 21. That theory conflicts with the ALJ's own analysis, however. The ALJ noted that those consultants "did not have the benefit of reviewing the record in its entirety including the claimant's psychotherapy notes," and the ALJ explained that he would add limitations beyond those found by the consultants. *Id.*

Quoting *Thomas v. Colvin*, 745 F.3d 802, 808 (7th Cir. 2014), the Commissioner emphasizes that "a claimant's RFC is a

matter for the ALJ alone—not a treating or examining doctor—to decide." True enough. But again, the ALJ actually found that Moy had "moderate limitations in concentrating, persisting, or maintaining pace…." AR 21. The point is not that the ALJ undervalued any particular piece of evidence but that the ALJ's conclusion regarding Moy's limitations was not reflected in the conclusion he drew about Moy's ability to work at a consistent production pace. See *Lothridge*, 984 F.3d at 1233 ("The ALJ's formulation here says nothing about whether Lothridge is capable of performing work at a sustained pace over an entire workday.").

The Commissioner argues that moderate limitations in concentration, persistence, and pace do not, under Agency regulations, "connote disabling restrictions such as the inability to sustain performance of any task over time." But the cited Agency regulations explain that "the spectrum of limitation that may constitute 'moderate' limitation ranges from limitations that may be close to 'marked' in severity to limitations that may be close to the 'mild' level." The regulations also note that people with "moderate" limitations may or may not qualify as disabled—a question that will be assessed in the residual functional capacity determination. Revised Medical Criteria for Evaluating Mental Disorders, 81 Fed. Reg. 66138, 66146–47, 2016 WL 5341732 (Sept. 26, 2016). The Agency's guidance makes clear that "moderate" impairments should be considered when an ALJ calculates the claimant's residual ability to work, which is exactly what the ALJ failed to do here. The Commissioner is right that a moderate limitation in any one domain of mental function does not always require a finding of disability, but in some cases it may. To enable meaningful review, the ALJ must at least describe what the moderate limitations are and how they

affect the claimant's ability to work. *Lothridge*, 984 F.3d at 1234 ("The ALJ's findings about the jobs Lothridge could perform needed to account in a meaningful way for the earlier findings that recognized her difficulties with concentration, completing tasks, and managing stress.").

The Commissioner cites *Pavlicek v. Saul*, 994 F.3d 777, 783 (7th Cir. 2021), for the point that there is no "inherent inconsistency between a moderate rating in the broad area of concentration, persistence, or pace, and the ability to perform simple, repetitive tasks at a consistent pace." In *Pavlicek*, we affirmed denial of benefits when an ALJ relied on a doctor's statement that a claimant could work at a "consistent pace particularly if … engaged in a simple, repetitive tasks" despite a checklist item marking the claimant as "moderately limited" in concentration and pace. *Id.* (cleaned up). The ALJ in *Pavlicek* justified the conclusion that the claimant could work at a consistent pace by expressly incorporating the doctor's recommendation that the claimant engage in only simple, repetitive tasks (which, according to the doctor, accounted for the claimant's pace-related limitations). *Id.*

Here, the ALJ offered no such justification. He simply said that, to account for Moy's moderate limitations in concentration, persistence, and pace, he provided that Moy could work at a consistent production pace. Without further explanation of why the other work-related restrictions nonetheless allowed Moy to work at a consistent production pace, we cannot conclude that the ALJ's decision was supported by substantial evidence.[3]

--------

[3] The Commissioner cites several other cases in support of his argument that other restrictions can account for limitations in

The Commissioner also argues that it should not matter that the ALJ did not impose any work limitations related to concentration, persistence, and pace because the *other* limitations accounted for Moy's reduced function. For example, the Commissioner argues that the restriction to non-hazardous work "addressed deficits in concentration," and that the restriction to only occasional and minor changes in work setting reflected deficits in persistence.

We do not think that any of the ALJ's noted restrictions accommodate Moy's persistence-related limitations. The ALJ acknowledged those deficiencies, AR 21, and they are documented extensively in the record. Recall that the vocational expert testified that if a person were regularly absent, tardy, or leaving early for two or more days a month, that person would "lose their employment." AR 52. Our review of the record shows that Dr. Kireem alone treated Moy roughly 35 times between July 1, 2020, and July 31, 2021, just "to maintain her sanity." AR 1132. Over the course of 13 months, this equates to nearly three days per month. Add to this Moy's

concentration, persistence, and pace. Most are not precedential, and the few that are precedential likewise support the point that for non-persistence-related restrictions to account adequately for a claimant's persistence-related limitations, the evidence must show that those restrictions will accommodate the claimant's persistence-related deficiencies. E.g., *Jozefyk v. Berryhill*, 923 F.3d 492, 498 (7th Cir. 2019) (affirming denial of benefits when ALJ restricted claimant to "limited interactions with others" and medical evidence showed that impairments surfaced "only when he is with other people or in a crowd"). Several other cited cases concluded that ALJs appropriately found no persistence-related limitations. They do not address the issue here. E.g., *Peeters v. Saul*, 975 F.3d 639, 641–42 (7th Cir. 2020) (ALJ conclusion that claimant did not have pace-related limitations was supported by substantial evidence); *Burmester v. Berryhill*, 920 F.3d 507, 511–12 (7th Cir. 2019) (same).

therapy treatments with Avallone, her appointments with Dr. Abraham and Dr. Nasir, and her separate medical appointments for unrelated physical ailments in early 2021. Nothing in the vocational expert's testimony makes it seem likely that a non-hazardous workplace (for example) would be any more tolerant of those absences than a hazardous workplace would be.

Further undermining our ability to accept the ALJ's reasoning, he downplayed the extent of Moy's treatment, saying that she attended therapy "irregularly and infrequently" and that Dr. Kireem's treatment was "infrequent and conservative." AR 20 & 22. As just explained, Moy's treatment by Dr. Kireem alone was frequent enough to impede her ability to work, at least, by the vocational expert's standards. More fundamental, it simply was not reasonable to characterize Moy's treatment as infrequent and conservative. In addition to the extensive therapy treatment detailed above, the record shows that Moy was taking a daily cocktail of anti-anxiety and depression medications, including Escitalopram, Alprazolam, Trazodone, and Propranolol (which is sometimes prescribed off-label for anxiety). She began taking all of these after she first reported to the hospital in June 2020.

This mischaracterization of the treatment record is important because a claimant's reliance on frequent treatment can make it difficult for her to work on a sustained basis. See *Voigt v. Colvin*, 781 F.3d 871, 874 (7th Cir. 2015) (remanding: "To miss four workdays a month would reduce one's average workweek from five to four days, which would not constitute working on a sustained basis as defined by the Commission."). While merely scheduling frequent doctor's appointments is not enough to require a finding of disability, see

*Bernard L. v. King*, No. 22 CV 00120, 2025 WL 296054, at *5
(N.D. Ill. Jan. 24, 2025) (collecting cases), Moy's therapy ap-
pointments are part of a broader treatment record that indi-
cates the severity of her symptoms and the degree of interrup-
tion those symptoms cause. Moy's extensive medication regi-
men is also significant because "a claimant's election to un-
dergo serious treatment, such as ... taking 'heavy doses of
strong drugs,' indicates that the claimant's complaints … are
likely credible," and "the fact that physicians willingly pre-
scribed drugs … indicated that they believed the claimant's
symptoms were real." *Scrogham v. Colvin*, 765 F.3d 685, 701
(7th Cir. 2014), quoting *Carradine v. Barnhart*, 360 F.3d 751, 755
(7th Cir. 2004). By improperly minimizing the extent of Moy's
treatment, the ALJ overlooked evidence that bears on Moy's
residual ability to work.

In addition to this evidence that Moy likely could not at-
tend work consistently over the course of weeks or months,
the record also indicates that Moy would likely struggle to
persist through *daily* work-related activities—which the voca-
tional expert explained would also mean "no work." AR 52.
The ALJ acknowledged several treatment records that de-
scribed Moy's severe symptoms, including "experiencing
traumatic events on a daily basis and through her dreams as
well as sleep paralysis and hallucinations." AR 20. As noted
above, for example, one report explained that Moy would
have panic attacks at work during which she would forget
some of her English. AR 514. Similarly, one of Dr. Kireem's
notes explained that Moy was "seeing a man with a beard be-
hind her most of the time that no one else sees. She feels
scared all the [time] and cannot go outside especially to
crowded places." AR 1099. And the ALJ also noted that Moy
was "crying at some counseling sessions, as well as at the

hearing in this matter"—behavior that would certainly impede her ability to persist through a normal workday.

It is hard for us to imagine—even under the stringent standards of the Social Security Act—how a person could stay on-task and serve tables or wash dishes in a professional setting while consistently crying, experiencing panic attacks, and hallucinating a killer over her shoulder. See *Lothridge*, 984 F.3d at 1233 ("We have repeatedly cautioned that 'someone with problems concentrating might not be able to complete a task consistently over the course of a workday, no matter how simple it may be.'" (quoting *Martin*, 950 F.3d at 373–74)); *Spiva v. Astrue*, 628 F.3d 346, 350 (7th Cir. 2010) ("An employee who stocks shelves at a Walmart … has to be able to interact with customers.… A psychotic person busy trying to cope with evil spirits and evil thoughts is not likely to be employable as a shelf stocker in such a store.").

The ALJ acknowledged these limitations when he noted that Moy "exhibited distractible attention during psychotherapy visits." But he noted that—on the other side of the ledger—she was able to attend medical visits, talk on the phone, and go shopping with her husband. There is plenty of evidence in the record indicating that Moy struggled with these ordinary activities, and we reiterate that such activities of daily living are not conclusive indicators of a person's ability to work in competitive employment. See *Rucker v. Kijakazi*, 48 F.4th 86, 93 (2d Cir. 2022) ("[A] claimant's regular attendance at medical appointments says very little about her ability to work during her appointments. Indeed, it would seem that a person suffering from [significant impairments] would have a strong interest in attending appointments and seeking relief rather than missing appointments." (internal quotation marks

omitted, quoting *Virden v. Colvin*, No. 14-CV-1219, 2015 WL
5598810, at *11 (C.D. Ill. Sept. 22, 2015))); *Loveless v. Colvin*, 810
F.3d 502, 508 (7th Cir. 2016) ("[W]e have criticized ALJs for
equating activities of daily living with an ability to work.");
*Bjornson v. Astrue*, 671 F.3d 640, 647 (7th Cir. 2012) (remanding
and noting recurring failures by ALJs to recognize differences
between activities of daily living and demands of competitive
employment); *Craft v. Astrue*, 539 F.3d 668, 680 (7th Cir. 2008)
(remanding because ALJ ignored claimant's qualifications "as
to *how* he carried out [daily living] activities").

The judgment is REVERSED with directions to REMAND
the case to the Social Security Administration for further con-
sideration of Moy's application for benefits consistent with
this opinion.